## McAuliffe, et al v. Helm, et al.

(Decided February 27, 1914.)

## Appeal from Warren Circuit Court.

1. Intoxicating Liquors—Local Option—Petition for Election.—A petition for a local option election, under Section 2554 of the Kentucky Statutes, may be filed at a special term of the County Court and the election ordered at the next regular term.

2. Intoxicating Liquors—Local Option—Jurisdiction of County Court to Order Election.—The jurisdiction of the County Court to order a local option election depends upon the sufficiency of the petition; the process of reasoning, or the method used in determining its sufficiency, cannot affect the court's jurisdiction if the petition has the required number of legal signers.

3. Intoxicating Liquors—Local Option—Election—Qualification of Signer to Petition.—The qualification of a signer to a local option petition under Section 2554 of the Kentucky Statutes is to be judged as of the day the application is filed in the County Court.

4. Intoxicating Liquors—Petition for Local Option Election—How Voter May Sign Name to Petition.—A legal voter may sign his name to a local option petition, under Section 2554 of the Kentucky Statutes, either in person or by his authorized agent; and the authority to sign for him need not be in writing.

5. Intoxicating Liquors—Local Option Act of 1912—Constitutionality of Act.—The local option law as amended by the Act of 1912, which makes the county the unit for holding such elections, is not unconstitutional.

6. Intoxicating Liquors—Local Option Election—Contest—Notice.— A notice to contest a local option election should be so specific and direct as to give reasonable information of the grounds on which the contest is based, so that the contestee may be pre-

pared to defend; but where the contestee goes to trial without asking that the notice- be made more definite or specific, he waives any insufficiency in the notice and will not be permitted thereafter to say that the notice was not sufficiently specific.

7. Elections—Policy of the Law to Uphold.—It is the policy of the law to uphold elections, and they will not be set aside for light or trivial reasons. In order to justify the setting aside of an election, the evidence should be positive and convincing.

8. Judgment.—The rule is well established that the finding of the chancellor, under contradictory evidence, will not be disturbed where the mind is left in doubt.

SIMS & RODES, MAX B. HARLIN, T. W. & R. C. P. THOMAS and HAZELRIGG & HAZELRIGG for appellants.

WRIGHT & McELROY, JOHN B. GRIDER and W. B. GAINES for appellees.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

This is a contest over a local option election held in Warren County on July 1, 1913.

In the afternoon of Saturday, March 22, 1913, a petition was filed in the county court pursuant to section 2554 of the Kentucky Statutes, requesting the county judge to order an election for the entire county, for the purpose of taking the sense of the voters thereof upon the proposition whether or not spirituous, vinous or malt liquors should be sold, bartered or loaned therein.

The following Monday, March 24th, was the first day of the regular March term of the Warren County Court; and the petition being then before the court for action, McAuliffe and the other appellants who opposed the calling of an election, moved the court to continue the case until the next regular term of the county court upon the ground that they had not had an opportunity to examine the petition or to prepare a defense thereto, claiming that there were many names signed to the petition which were illegal, others that had been duplicated, and the names of some who had withdrawn their names, or who desired to so withdraw them. That motion having been overruled, appellants next moved the court to continue the case for three days; but that motion was likewise overruled. Appellants then demurred to each and all of the petitions, and the demurrers were overruled. Appellants thereupon moved the court to require oral proof in court, subject to cross-examination, as to the genuineness of the signatures and the qualifica-

tions of the signers of the petitions; and this motion having being overruled, the same parties further moved the court to grant them thirty minutes to examine the petition of each of the 20 precincts, as it should be called. This motion was also overruled.

In the meantime, however, 42 signers petitioned the court to withdraw their signatures, and ten of the 42 subsequently signed revocations of their withdrawals. After all this had been done, the court being satisfied with the legality of the signers, and the sufficiency of the petition, ordered the election to be held on July 1, 1913.

The election having gone against the sale of liquor, the appellants contested it before the Board of Contest; and that board having decided in favor of the validity of the election, an appeal was taken to the circuit court. That court also sustained the election; and from that judgment this appeal is prosecuted.

1.   It is contended the county court judge was without jurisdiction to call the election because the petitions were not filed at a regular term of the court.

This election was called under section 2554 of the Kentucky Statutes, which reads, in part, as follows:

"Upon application, by written petition, signed by a number of legal voters in each precinct of the territory to be affected, equal to twenty-five per cent of the votes cast in each of said precincts at the last preceding general election, * * * it shall be the duty of the judge of the county court in such county, at the next regular term thereof after receiving said petition, to make an order on his order book, directing an election to be held * * *"

In construing this statute in Smith v. Patton, 103 Ky., 444, this court held that the application for the election might be filed at a special term of the court, called upon any day previous to the beginning of the regular term at which the election could be ordered. It is now contended that Smith v. Patton practically overruled Doores v. Varnon, 94 Ky., 507; Webb v. Smith, 99 Ky., 11; Wilson v. Hines, 99 Ky., 221, and Cress v. Commonwealth, 18 Ky. L. R., 633, 37 S. W., 493, wherein appellants claim it was, in effect, held that the application for the election must be filed at a regular term, and should lie over to the next regular term before the election could be legally ordered. We are, therefore, asked to overrule Smith v. Patton, and to hold that the petition must be filed at a

regular term of the court, and lie over to the next regular term for action.

In the cases relied upon, however, it was held that the order calling the election should not be made on the same day that the petition was filed; and that while the petition must be filed at one term, the order could not be made until the next term; it could not be made at the same term.

That such was the effect of those cases is made plain by the following excerpt from the opinion in Smith v. Patton, where, after reviewing those cases, the court said:

"The question as to whether the petition could be received and noted of record at a called term, was not considered or passed upon in either of the cases cited. And while the speculation indulged in in Doores v. Varnon, as to the probable motive that induced the Legislature to require a postponement of the entry of the order of election to a subsequent regular term from that at which the petition was received and filed, tends to support the contention of appellant as to the proper construction to be given to the statute, it is well to remember that it is the decision, or judgment rendered in the case, and not the opinion of the court, which makes the precedent. (See Black on Interpretation of Laws, p. 384.)"

In referring to the construction thus given the statute, this court in Doody v. Bowman, 142 Ky., 153, said:

"Counsel criticise the construction placed on the statute in the cases mentioned, but they have been too long adhered to to justify us in departing from the rule announced. The observance of it does not work any hardship or impose any unreasonable duty upon petitioners who desired to call an election. It is just as easy and convenient to file the petition at a regular, or a special term, as it was held in Smith v. Patton, *supra,* might be done, and have the election ordered at the next regular term, as it is to file the petition on the same day upon which the order calling the election is made."

The ruling thus announced by this court has been followed so long and so uniformly as to make the change suggested a question for the Legislature. This construction having been followed for many years, without a change in the statute, it is to be presumed the Legislature approved the construction there given; otherwise it would have acted upon that subject.

2. Appellants next insist that the county court having overruled their several motions and demurrers as above indicated, and having declined to hear further oral proof upon the legality of the signers and the sufficiency of the petitions, there was no judicial determination that the jurisdictional facts necessary to authorize the calling of the election existed. We cannot agree with this view of the case. The petitions were regularly filed, and if the number of legal petitioners was sufficient to satisfy the statute, the court had jurisdiction to enter the order; but if the number of legal petitioners was not sufficient to satisfy the statute, the court was without jurisdiction to enter the order. The process of reasoning or method of investigation used by the county judge can not affect the question of jurisdiction. Persons opposing the call for an election are entitled to a reasonable opportunity to present proof as to the sufficiency of the petition; but they are not entitled to a postponement for the purpose of getting petitioners to withdraw their names from the petition. May v. Duncan, 157 Ky., 586.

In this case, it is sufficient to say that the county judge in ordering the election evidently reached the conclusion from the proof before him that the petitions were sufficient as to signers, both in character and in number, excluding the 32 who had withdrawn from the petition. Cases of this character usually excite a great deal of feeling, thus rendering the duty of the county judge a difficult one. The case at bar is no exception to the general rule. Appellants insist that the petitioners were trying to "railroad" the petition through without a hearing from the opposition; while the petitioners contend, with equal vehemence, that the opposition was trying to delay the action of the county judge upon the petitions beyond a reasonable time. There is some evidence tending to sustain both contentions, although we are of opinion that neither is fully justified. The county judge had a discretion as to the manner of trying the application in so far as it applied to the verification of the petition, and it does not appear that he abused that discretion. He had jurisdiction to pass upon the question before him; if he erred, his ruling is not void, but erroneous only, and can be corrected by contest proceedings where the sufficiency of the petition is still subject to review.

3. In determining whether certain of the petitioners in this case satisfied the requirements of the statute, it

is necessary to determine as of what time the petitioner's qualifications shall be judged. Are his qualifications to be looked at as of the time he signs the petition, or at the time the petition is filed, or at the time the order is entered calling the election? To illustrate: the petition, as above stated, was filed on March 22nd, while the election was ordered on March 24th. Joe Richey, a petitioner in the Lazarus Barn Precinct, and a legal voter at the time he signed the petition, moved out of the precinct on Sunday, March 23rd, after the petition was filed and before the election was ordered. Was he a qualified petitioner?

To each of the three constructions of the statute above suggested, plausible objections can easily be made; but after a careful reading and consideration of the statute, we have concluded that the qualifications of a petitioner must be judged as of the day the petition is filed in the county court; that being the day of the "application" required by the statute. When the petition has been so filed the petitioners have done all the statute required of them; and, that being true, the action of the county judge in delaying final action should not be permitted to render insufficient a petition that was sufficient when filed.

In Commonwealth v. Shelton, 99 Ky., 120, it was held that the sixty day period within which the election could not be held begins with the day the application is lodged with the county court judge. The same rule should apply in fixing the date by which the petitioner's right to vote is to be tested.

4. Again, in many instances in this case the names of the petitioners were affixed to the petition by some person other than the petitioner, and in some instances not even in the presence of the petitioners. The question therefore arises, can a person who is a legal voter authorize another person to sign the voter's name to the petition? And, if that can be done in the presence of the petitioner, who, perhaps, can neither read nor write, can it also be done in the absence of the petitioner, upon a mere verbal authorization?

It is claimed there are many such instances in the case before us, and that the legality of the petition and the result of the election may depend upon the decision of that question in connection with these particular petitioners.

Section 1345 of the Kentucky Statutes, found in the chapter entitled "Crimes and Punishments," reads as follows:

"Whosoever shall sign the name of another, or a name to a petition, memorial or remonstrance addressed and presented, or intended for presentation, either to the General Assembly, a county court, or the Governor of this Commonwealth, without authority from the person whose name is so signed, or where there is no such person, shall be deemed guilty of a misdemeanor, and fined not less than fifty nor exceeding five hundred dollars."

It would seem that this statute is decisive of the question, since it expressly provides a punishment for any person who shall sign the name of another to a petition intended for presentation to a county court, without authority from the person whose name is so signed; and, that being true, it necessarily follows that a person may lawfully sign the name of another to such a petition by the authority of the person whose name is so signed. If, in the case at bar, the persons who signed the names of others to the petition had authority from them to so sign their names, the persons who signed the names of such others could not be punished under this statute. In our opinion one person may sign the name of another to a petition to be presented to the county court under section 2554, *supra*, provided he has authority from the person whose name is so signed; and the authority need not be in writing.

5.   It is insisted that the County Unit Law as amended in 1912 is in violation of section 61 of the Constitution of Kentucky; also of section 6 of the Kentucky Bill of Rights, and of the Fourteenth Amendment to the Constitution of the United States.

Section 61 of the Constitution of Kentucky reads as follows:

"The General Assembly shall, by general law, provide a means whereby the sense of the people of any county, city, town, district or precinct may be taken as to whether or not spirituous, vinous or malt liquors shall be sold, bartered or loaned therein, or the sale thereof regulated. But nothing herein shall be construed to interfere with or to repeal any law in force relating to the sale or gift of such liquors. All elections on this question may be held on a day other than the regular election days."

Section 6 of the Bill of Rights, further provides that "All elections shall be free and equal;" while the 14th amendment to the federal constitution does not permit a State to make or enforce any law which abridges the privi-leges of the citizen, or to deny to any person the equal protection of laws. The Act of 1912 makes the county the unit for holding elections under the local option law. Acts 1912, p. 6.

It is claimed that section 61, *supra,* gives to the peo-ple of cities, towns, districts and precincts the independ-ent right to determine for themselves whether liquor shall be sold within their respective territories, and that it was the primary purpose of the statute known as the "County Unit Law" to deprive those units of that right, by submitting that question to the voters of the entire county. In view, however, of the fact that the principle embodied in the Act, and to which objection is now made, has been repeatedly approved by this court in cases wherein similar statutes have been upheld, we do not now deem it necessary to again go into that question. The doctrine of *stare decisis* requires that after a rule has been once established, it should not be lightly ab-rogated. South v. Thomas' Heirs, 7 T. B. M., 59; Trib-ble v. Taul, 7 T. B. M., 455; Hackett v. First Nation Bank, 114 Ky., 197.

6. It is insisted by the appellees, who were the con-testees below, that the notice of contest was not sufficient, because, it appearing from the petition that the requisite number of voters had signed the petition, it was incum-bent upon the contestants to specify such signers as they claimed were not legal voters, and that having failed to do so, the notice was for that reason, insufficient.

In Weller v. Mueninghoff, 155 Ky., 88, we said:

"We think the statute contemplates that the notice, whether it be a notice by the contestant or a counter notice by the contestee, should be so specific and direct as to give to the other party reasonable information of the grounds on which the contest is based, so that he may be prepared to defend, and when the notice is too in-definite or insufficient to furnish this information, the court, upon motion of the complaining party, if such motion is made, should require the notice to be made more specific or else entertain a motion to strike the in-definite parts from the notice. Pace v. Reed, 138 Ky., 605, Edwards v. Logan, 114 Ky., 312. * * *

"Of course if both parties, without raising any objection, are willing to try the issues on an indefinite and insufficient notice or other pleading, neither of them will be heard after the case has been submitted for judgment to raise a question as to the sufficiency of the notice or pleading. But we think that when the legality of certain votes are put in issue, the notice should contain the names of the challenged voters and the precinct at which they voted, and that no others than those named in the notice or in a supplemental notice filed in seasonable time, in response to a motion to make more specific, if one is made, can be considered."

In view of the fact that 32 petitioners withdrew their names from the petition before the election was ordered, and that appellants contended that 35 more were not legal voters, it is insisted that the rule or pleading above relied upon required the contestants to show specifically the names of the persons who had so withdrawn their signatures, as well as those claimed to be non-voters. We think the rule above laid down in Weller v. Mueninghoff is not only a satisfactory rule, but it is applicable to and is controlling in this case. The contestees made no motion to require the contestants to make their notice more definite or specific; they merely filed a demurrer to the notice, treating it as a petition. A demurrer, however, cannot be used to make a pleading more specific and certain; that question can only be raised by a motion to require the pleader to so perfect his pleading; and in case he fails to do so when ordered, the objectionable part will be stricken from the pleading. In this case, however, as well as in the Weller and Mueninghoff case, the appellees, who were contestees, proceeded to trial entirely satisfied with the notice and without asking that it be made more definite and specific. In so doing, contestees treated the notice as sufficiently specific to notify them of the purpose of the action; they will not now be permitted to say that the notice did not satisfy them.

7. Finally, it is insisted that twenty-five per cent of the legal voters in the Lazarus Barn Precinct No. 23 did not petition for this election. If that is true, the election was improperly called, since the statute requires that twenty-five per cent of the legal voters of each precinct in the county must petition for the election before it can be ordered. The court had no jurisdiction to order

the election unless it had before it, at the time, a petition that satisfied the requirements of the statute. It is agreed there were 324 legal votes cast in the Lazarus Barn Precinct No. 23 at the last preceding general election, and that the petition from that precinct must have contained the signatures of 81 legal voters. The petition, as filed, contained 123 signatures; of these 42 withdrew their signatures on March 24th, before the election was ordered, but of the 42 who withdrew, 10 signed revocations of their withdrawals, asking that their names be restored to the petition and counted, which was done. This reduced the net withdrawals to 32, which, taken from the 123 original signers, left 91 names upon the petition from the Lazarus Barn Precinct. Of these 91 petitioners, 35 have been contested, thus leaving 56 uncontested.

In dealing with this branch of the case, the circuit judge said:

"The result of said election, thus obtained should not be set aside for light or trivial reasons; and the evidence upon which it is now sought to invalidate said order, should be positive and convincing. According to my view, the court must in any question of doubt and uncertainty as to disputed facts resolve that doubt in favor of, rather than against the legality or validity of the election. It is the settled policy of the law to uphold elections, for reasons that scarcely admit of argument; and in passing upon the acts of a county judge in ordering an election, pursuant to a statutory requirement, it seems to me to be sound policy to refrain from a decision that would invalidate that order, except where the evidence makes such a decision imperative, and this rule I have adopted in considering the mass of conflicting evidence relating to the names that are in contest in this case.

"It is agreed that 81 names constitute the necessary 25 per cent in Lazarus Barn Precinct. The names of 56 petitioners are not attacked; in fact, the name of J. B. McGuire should be included in this list, as contestants made no attack on him in their testimony, in chief. If the list stands at 56 there would be required 25 more to make the 81, and if McGuire's name is included, 24 names would be required to make the 81. Leaving out McGuire, there are 32 names attacked and in contest. Many of these, signed withdrawals, and revocations of

withdrawals, and in some instances withdrawals of revocations of withdrawals. Some deny signing the application or giving authority to any other to sign for them and concerning each case, and every disputed fact, witnesses have testified on each side, in some of the cases a great many persons testifying.

"I shall not review the evidence in detail. Counsel for each side were kind enough to furnish to the court, a carefully prepared digest of the testimony, with the names of witnesses on each point, and references to the exact page in the record where the testimony could be found, by the aid of which I have carefully reviewed such of the testimony that I did not clearly remember; and I have reached the conclusion that there should be counted 28 of the 32 that are contested. John J. Gott, W. H. Herrington, P. L. Sang and Wood Daw are not counted. The first three had not lived in the precinct long enough to make them legal voters, and the testimony tends strongly to show that no such person as Wood Daw lives in that precinct. The 28 added to 56 gives 84 and to this should be added the name of McGuire which makes 85.

"A conscientious examination of the evidence as to many of the names, notably as to that of Richey, Moore, Lamar, Collins, Sol. Green, L. Kirby and perhaps others produce in my mind, extreme doubt and uncertainty, as to the utter correctness of the position here taken; but I am firmly convinced that, as stated hereinabove, such doubt should be resolved in favor of, rather than against the validity of the order, and that, following the settled doctrine herein announced, the election should be upheld unless it should plainly be made to appear that it was illegally called."

The record fully justifies the statement that one or more witnesses testified upon either side of every disputed fact. By way of illustration, we will briefly refer to the evidence relating to a few of the 35 contested petitioners.

Jeff Rogers is 56 years old; can neither read nor write, and lived in the Lazarus Barn Precinct. He says Smith and Hagan asked him to sign a "dry" petition, Patterson being present at the time; that he did not sign it, but did sign a "wet" petition. On the other hand, Jones and Patterson both state that the "dry" petition was read to Rogers; that Patterson signed his name and

made his mark, Rogers touching the pencil at the time; and that this occurred at the corner of Main and Potter streets in Bowling Green.

Orville Harris' name appears upon the petition, upon a withdrawal, and upon a revocation of a withdrawal. He denies however, having signed either the petition or the revocation, but admits having signed the withdrawal at the Elks Building on Saturday night; that Lewis and Smith called at his house and asked him to sign a withdrawal of his withdrawal made at the Elks Building, but that he did not do so. On the other hand, Patterson says he and Lewis went to Harris' home on Sunday night, but he did not go into the house with Lewis; but Lewis and Smith both swear that Harris had retired when they reached his house; that he sat up in the bed, and placing the paper upon a small book, signed the second withdrawal.

W. W. Harris, a white man 33 years old, works at the axe-handle factory. He cannot read or write, but is able to sign his name. He admits he signed a "dry" petition, claiming, however, it was under the false representation that it was a "wet" petition, and that he signed it at the Elks Building on Sunday morning, at the instigation of Patterson and Lewis. He subsequently signed a withdrawal; and when Patterson and Lewis went to see him on Sunday night to sign a revocation of his withdrawal, he says he did not sign it. Patterson states, however, that he went to Harris' house on Sunday night, and after having explained the paper to Harris, he, in the presence of Patterson and Lewis, signed the revocation; and in this Patterson is corroborated by Lewis.

R. M. Harris, a painter 54 years of age, says he signed the petition at the request of Herndon, but that he did not read it before signing, and afterwards signed a withdrawal. Subsequently, at the request of Lewis and Smith, Harris signed a revocation of his withdrawal. He says Lewis and Smith told him it would not interfere with any one he had theretofore signed; and although he asked them what kind of a paper it was, he does not remember what they said. At any rate, he signed the revocation, Smith attesting it.

Arnett, a deaf mute, readily signed every paper that was presented to him—a petition, a withdrawal, and a

revocation of his withdrawal. His testimony seems to indicate that Arnett is something of a humorist, since he turned his examination into a farce, answering almost every question through an interpreter with the monosyllable "wet." No intelligible answer could be procured from him. It appears, however, from the testimony of Mr. Rodes, who was Arnett's lawyer, that Arnett could read and write; had communicated with Rodes by writing; that Rodes had attended the same Sunday school with him, and had subsequently gotten a divorce for Arnett. Lewis also testifies that Arnett is an intelligent man; works at the axe-handle factory; traded at Lewis' grocery, and would write out his orders. Moore also says Arnett is an intelligent man, and that he has communicated with him upon business matters, and had no difficulty in understanding him. It is conceded by both sides that Arnett signed the three papers, thus leaving his name upon the petition.

John Laurence, a colored man 44 years old, says he signed the petition, but without knowing its purpose, and that if he had known its true character he would not have signed it. Gardner, his lawyer, however, testifies that he signed the name of Laurence to the petition at Laurence's direction, after the petition had been fully explained to him; and that after the election Laurence said to Gardner he was glad he had signed it.

Erwin, a white man 30 years of age, says Patterson and Harvey told him they wanted his name on the petition, and he told them to "take it," and they did. He declares he did not sign the petition, but afterwards signed a withdrawal, and that when Patterson again went to see him for the purpose of getting him to sign a revocation, Erwin again said for him to "take it." On the other hand, Patterson says he saw Erwin on Saturday night at his home, and that Erwin signed the revocation himself. Patterson is corroborated by Harvey, who was present and saw Erwin sign.

We do not deem it necessary to extend this examination to each of the 35 contested petitioners, since the testimony, in at least 25 of the 35 contested petitioners, is of the same general character as above indicated and outlined. If these are counted they will more than make up the requisite 81 petitioners in the Lazarus Barn Precinct.

In every one of the cases indicated, the testimony is contradictory and unsatisfactory. The rule is well established that the finding of the chancellor, under contradictory evidence, will not be disturbed, where the mind is left in doubt. Byassee v. Evans, 143 Ky., 415; Wathen v. Wathen, 149 Ky., 505; Bond v. Bond, 150 Ky., 392. He knew the witnesses, or many of them, and was in as good if not a better position than this court, to give the proper weight to the evidence, and thereby arrive at a correct conclusion.

Upon the whole case we do not feel justified in disturbing the finding of the chancellor.

Judgment affirmed; the whole court sitting.