## Wallbrecht, et al. v. Ingram, et al.

(Decided May 4, 1915.)

### Appeal from Bell Circuit Court.

1. Elections—Voters Must Present or Offer to Present Their Certificates of Registration.—Under Section 1488 of the Kentucky Statutes no person who is required to register shall have the right to vote until he has presented or offered to present to the election officers his certificate of registration; but if the voter presents his certificate or offers to produce it, this will be a sufficient compliance with the statute.

2. Elections—Grounds of Contest—Permitting Persons to Vote Without Producing Certificates.—Where an election is contested on the ground that registered voters were not required to produce, and did not offer to produce registration certificates, the notice of contest should give the names of the voters who voted without doing this.

3. Elections—Contests—Evidence Not Sufficient.—Although the insufficiency of the notice may have been waived by failure to take steps to make the grounds more specific, if the evidence does not show how many persons were permitted to vote without producing or offering to produce their certificates, the ground of contest will be unavailing.

4. Elections—Ballots—Number to be Furnished.—Under Section 1465 of the Kentucky Statutes, the clerk is required to furnish .50 per cent. more ballots for each precinct than there were votes cast in the precinct at the last State or National election. This statute is mandatory and the clerk is not authorized to furnish more ballots than it provides for, although he may have information by affidavit or otherwise that the number authorized will not be sufficient.

5. Elections—Ballots—When Clerk May Furnish Extra Ballots.—If the ballots furnished by the clerk should be lost or destroyed or stolen, he may supply other ballots to take their place if he can do so in time to permit the election to be held.

6. Elections—Free and Equal Election Defined.—Strictly speaking, a free and equal election is an election at which every person entitled to vote may do so if he desires, and when any substantial number of legal voters are, from any cause, denied the right to vote, the election is not free and equal in the meaning of Section 6 of the Constitution.

7. Elections—Free and Equal.—This constitutional provision is mandatory, and an election is not free and equal when any substantial number of persons entitled to vote are denied the right to do so on account of fraud, intimidation or other wrong-doing, or because of some imperfection or insufficiency in the election laws.

8. Elections—Free and Equal Election.—An election at which 448 voters were prevented from voting on account of the ballots giving out, was not a free and equal election, although the statutory number of ballots were furnished.

9. Elections—How Results Should Be Declared When Not Free and Equal.—If the number of votes prevented from being cast on account of fraud or other wrong-doing, or insufficiency of ballots, or other cause, would be sufficient to change the result if they had been cast for the minority, the election should be set aside, and so if the fraud or other cause has affected the election to such an extent that it cannot be determined for which side a majority of the legal votes were cast. But if there should be added to the minority votes all the votes that it is ascertained were prevented through any cause from being cast, and this addition does not affect the result, the election should be upheld.

10. Elections—Facts of This Case.—At this election there were 4,328 votes cast—2,443 against the sale of liquor, and 1,885 for, leaving a majority of 558 in favor of prohibition. 448 persons were prevented from voting on account of the shortage of ballots. But if all these votes were counted in favor of the sale, it would not affect the result; and so the election is upheld.

HAZELRIGG & HAZELRIGG and L. F. DeBUSK for appellants.

N. R. PATTERSON for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

The question involved in this case is the validity of an election held in Bell County in September, 1914, under the "county unit law." The election is assailed on the ground that the legislation known as the "county unit law" is unconstitutional and that the act of 1912, now section 2560 of the Kentucky Statutes, containing this legislation, was repealed by the act of 1914, now Sections 2554 and 2557 of the Kentucky Statutes.

These two questions were considered in the case of Young, et al. v. Trimble, et al., 164 Ky., 177, and were disposed of adversely to the contention of the appellants here. This makes it unnecessary to extend this opinion in reiterating what was said in the opinion in these cases.

The validity of the election is further assailed on the ground that the election should be set aside on account of the failure of the election officers in Pineville precinct to require the voters to exhibit their registration certificates before they were permitted to vote, and in permitting a large number of the voters in this precinct to vote without exhibiting or offering to exhibit these certificates.

Another ground urged for setting it aside is that it was not a free and equal election within the meaning of Section 6 of the Constitution providing that "all elections shall be free and equal."

Taking up first the complaint as to the manner in which the election in Pineville precinct was held, it is provided in Section 1488 of the Kentucky Statutes that "No person, who is required to register under the provisions of this act, shall have the right to vote at any election held in this Commonwealth until he shall have presented to the election officers his certificate of registration."

In construing this statute, it was held, in DeHaven v. Bowmer, 125 Ky., 800; Com. v. Glass, 140 Ky., 589, and Taylor v. Betts, 141 Ky., 138, that the possession of a registration certificate where registration was required, was necessary to enable the voter to cast his vote. But, we said in the Betts case that "We are not inclined to hold, however, that the mere failure of the officers to examine the certificate of registration is sufficient to disfranchise the voter. If the voter presents his certificate of registration, or states that he has the certificate and offers to produce it, this will be sufficient; one or the other he must do, for it is a prerequisite to his right to vote. If he votes without presenting, or offering to present, his certificate, he votes when he is not entitled to vote, and, therefore, his vote cannot be counted.

Let us now see what is shown by the record concerning the action of the officers at Pineville precinct in permitting persons to vote without producing or offering to produce their registration certificates. It was averred in the grounds of contest that "at precinct Number One, in the city of Pineville, registration of voters being there required by law, the officers of the election did not require voters to exhibit their registration certificates or to produce them to the officers before voting, but permitted them to vote without the production of their registration certificates, and a large number of persons voted in said precinct without presenting registration certificates, in violation of the provisions of the Statutes of the Commonwealth of Kentucky in such cases made and provided." This is all that is said in the grounds of contest on this subject.

The answer of the contestees merely traversed these averments.

It will be observed that the grounds of contest did not give the name of any voter in Pineville precinct who was permitted to vote without producing or offering to produce his registration certificate, nor did it state the number of persons who were permitted to vote at this precinct without producing or offering to produce their certificates.

We think that where an election is contested upon the ground that persons were permitted to vote at a designated precinct without producing or offering to produce their certificates of registration, the notice of contest should give the names of the voters who were

permitted to vote without producing or offering to produce to the election officers their certificates, and that when the notice does not furnish this information, the court, upon notice, should require it to be made more specific. In short, the practice approved in Weller v. Muenninghoff, 155 Ky., 77; Butler v. Roberson, 158 Ky., 101, and McAuliffe v. Helm, 157 Ky., 626, should be followed. But if this uncertainty in the notice of contest should be deemed to have been waived by the failure of the contestees to ask that this ground of contest be made more specific, the evidence offered in behalf of the contestants does not show how many persons were permitted to vote without producing or offering to produce their certificates, nor the number of votes cast in this precinct at this election.

The only witnesses who testified with reference to the election at this precinct were J. T. Metcalf and H. Clay Rice.

Metcalf, in answer to the question, "State whether or not the officers of election required the voters, before voting, to present and show their certificates to the officers of election?" answered, "Not in every case. The officers of election, immediately upon being given the name of an applicant for a ballot, would turn to the registration book and look for his name, and if his name and his residence, street and location of his residence, was what he said it was, and what the election officer knew to be a fact, we did not require them to show their registration slips, but in case there was any doubt in the minds of the election officers as to the identity of the voter, we did require the registration slip to be shown. Q. State, if you remember, if there was a great many of the voters who voted that you were convinced had a right to vote without showing their certificates, or whether there was only a few? A. Nearly every man that came in to vote started to show his certificate, but if there was no doubt in the minds of the officers, we just checked him off the registration book that was furnished us and gave him a ballot. Q. And did not require him to show his certificate or present it to the officer? A. Not where there was no doubt in the minds of the officers that he had a right to be given a ballot."

H. Clay Rice, another election officer at this precinct, selected by the "wets," was asked: "State if you remember whether or not parties who voted presented,

showed and exhibited to the election officers their certificates of registration before they were permitted to vote? A. Some of them voluntarily did, and many of them did not, because we had kind of an understanding that we would not require them to show registration certificates as long as we had the registration books before us. Q. Do you know the names of any parties who were not required and did not show their certificates? A. I could not recall any particular name. I know there was a great many. I dare say there was 75% of those that voted that did not show their registration certificates because we did not ask for them."

With the evidence in the condition stated, we have no means of knowing how many voters in this precinct were permitted to vote without producing or offering to produce their certificates of registration, and, of course, cannot say what effect it would have on the result if the votes of those who voted without producing or. offering to produce their certificates were eliminated. Under these circumstances it is apparent that the ground of contest, in so far as this precinct is concerned, has not been sufficiently presented by the evidence to enable us to announce any opinion as to whether the result of the election was affected by illegal votes in this precinct. We may, therefore, dismiss this ground of contest without further comment.

The contention that the election was not free and equal is rested on the ground that at three precincts in the county a sufficient number of ballots were not furnished to permit all the persons legally entitled to vote in these precincts to cast their votes. Before considering the law controlling the decision of this question, it will be convenient to set out the facts disclosed by the record upon which counsel for appellants rely to show a violation of this constitutional requirement.

The shortage of ballots complained of occurred in the precincts known as Clear Fork, Bennett's Fork, and Straight Creek. It is shown by the evidence that in Clear Fork precinct 73 ballots were furnished by the clerk, and that the ballots gave out in this precinct about nine o'clock in the morning. It is further shown that there were in this precinct on the day of the election about 250 legal voters, although it does not appear that this number of persons, excepting the 73 who voted, desired to vote at the election or would have voted if there had

been a sufficient number of ballots. Some of the witnesses, however, estimated that probably 50 of the persons entitled to and who were present at the polls to vote were denied the right on account of the shortage of ballots. If, however, it should be assumed that the 250 voters in this precinct would have voted, if there had been a sufficient number of ballots, after deducting therefrom the 73 who voted, it would appear that there were 177 voters who were denied the right to vote on account of the shortage of ballots.

At Straight Creek precinct 210 ballots were furnished and the ballots gave out about noon. The evidence shows that in this precinct there were about 300 legal voters, although it does not appear that more than 25 or 30 persons were about the polls to vote, but could not on account of the shortage in the ballots. If it should be assumed that all of the voters in this precinct would have voted if there had been sufficient ballots, 90 persons were prevented from voting on account of the shortage of ballots.

At Bennett's Fork precinct the ballots gave out about nine o'clock and when only 119 votes had been cast. The evidence tends to show that there were in this precinct 300 legal voters, and so if it should be assumed that all the legal voters in the precinct would have voted if there had been a sufficient number of ballots, it would appear that 181 persons were prevented from voting on account of the shortage of ballots. In other words, on the assumption that all the voters in these precincts would have voted if there had been sufficient ballots, it may be said that 448 voters in these three precincts were denied the right to vote on account of the shortage of ballots.

It also appears that 4,328 votes were cast at this election, 2,443 in favor of the prohibition of the sale of liquor, and 1,885 in favor of permitting its sale, thus leaving a majority of 558 in favor of prohibition.

It is provided in Section 1465 of the Kentucky Statutes that "It shall be the duty of the county court clerk to cause to be printed, bound and ready for distribution one book of stubs and ballots for each voting precinct in his county, and shall furnish 50% more ballots for each precinct than there were votes cast in said precinct at the last State or National election."

There is evidence tending to show, although it is neither clear nor satisfactory, that previous to the election and before the ballots were ordered to be printed by the clerk, he was advised by the affidavits and demands of one or more voters in these precincts that the statutory number of ballots would not be sufficient to accommodate the voters, and was requested to furnish extra ballots. But the affidavits referred to are not in the record, nor does it appear with any degree of certainty what they contained or what representations were made to the clerk by the persons who spoke to him concerning the probable shortage of ballots at these precincts if only the statutory number were furnished.

The clerk testified that he had some recollection of such representations and requests, but could not state with any certainty what was said, nor could he produce any affidavits. It is agreed, however, that the clerk furnished to each of these precincts the number of ballots he was required by the statute to furnish. Now, if the clerk had been advised sufficiently by affidavits or otherwise satisfied that the statutory number of ballots would not be sufficient to enable all the voters in these precincts to cast their votes, would he have been authorized to furnish a greater number of ballots than the statute provides for?

It will at once be seen that this presents an important question and one that might possibly arise in any hotly-contested election where the contending parties were making strenuous efforts to secure the presence at the polls of every voter in the territory affected. At such an election it might happen in some precincts, as it did in the case we have, that twice or even three times as many legal votes could be induced to come to the polls as were present at the last preceding State or National election, due to the fact that little interest may have been taken by the voters in the last preceding State or National election, or to the fact that a large number of persons entitled to vote had moved into the precinct since that election. And so it is apparent that unless there be some remedy for this condition persons entitled to vote might occasionally be denied the right to vote in some precincts at some elections. It is not, however, likely that this condition would often occur, or occur at all except in a few precincts, for, as a rule, with few exceptions, about the same percentage of voters in each

precinct vote at every State and National election, and the statutory number of ballots is usually ample. But, nevertheless, when a condition like this does arise, the result will be that some persons entitled to vote and present at the polls for the purpose, will be denied the privilege, and this fact alone should be sufficient to secure the question careful consideration.

That it was the purpose of the Legislature to make provision for a sufficient number of ballots at each precinct cannot be questioned. The entire election law and every feature of it show that the Legislature carefully and in good faith endeavored to provide means for the holding of fair as well as free and equal elections, to the end that every person in the State entitled to vote might have opportunity to do so.

It is also apparent that while it was the legislative purpose to insure a sufficient number of ballots at each precinct, it was also the purpose to remove the temptation for fraud that might present itself unless the matter was controlled by uniform and fixed legislation. And so the provision was made that the clerk should furnish 50% more ballots than there were votes cast in the precinct at the last preceding State or National election. That this number of ballots has been generally found sufficient in every election that has been held in the more than twenty years this provision has been in force is, we think, very well established by the fact that there has never been, so far as we are aware, any effort to amend the law in this respect.

We think, in the light of this experience, it may be assumed that in the future, with rare exceptions, the statutory number of ballots is all that will be required in any precinct. We have here, however, a case in which it appears that the statutory number of ballots were not sufficient in three precincts out of the twenty-nine involved in this election; and it also appears that some four hundred voters were, or would have been, prevented from voting in these precincts if they had offered to vote, by reason of this shortage in ballots. This, of course, is an unfortunate condition, because the Constitution, as well as the statute, contemplates that every person entitled to vote shall have the right to do so, but if there are not enough ballots this right is necessarily denied to those who offer to vote after the ballots have run out.

It has been suggested that a condition like this might be remedied if, upon a satisfactory showing made to the clerk before the ballots were printed by persons acquainted with the necessity for more ballots than the statute provides for, he should be authorized to exceed the statutory number and furnish any precinct what appeared, from the representations made to him, a sufficient number of extra ballots to accommodate the voters in the particular precinct.

The difficulty, however, in adopting the suggested relief is to be found in the fact that it would operate to materially change the statute. The statute is simple and direct as well as mandatory in its nature, and we are not aware of any rule of law or authoritative precedent that would authorize us to alter or amend it by any direction that would permit the clerk to furnish a larger number of ballots than the statute provides for.

Under these circumstances, although recognizing that occasionally, as in this case, a failure to furnish a sufficient number of ballots may operate to deprive some persons of the right of suffrage, we do not feel at liberty to announce any remedy along the line suggested. We think the safe course to pursue is to leave the matter as the Legislature arranged it, subject, of course, to its power to make such changes as it may think proper.

The application of what we have said on this subject is, of course, to be confined to the precise question before us, and we do not mean to hold that if by some misfortune, accident or fraud the ballots furnished by the clerk should be lost or destroyed or stolen, the clerk might not supply a sufficient number of ballots to take the place of those lost, destroyed or stolen, if he could do so in time to permit the election to be held in the manner provided by law. A course like this was approved in Scholl v. Bell, 125 Ky., 750. It appears from the opinion in that case that on the morning of the election day the county clerk was informed that the ballots in four precincts had been lost or stolen, and he took steps to have them reprinted, in order that the election might be conducted. However, after obtaining the advice of counsel, and being advised that he had no right to thus supply the ballots, he did not do so. In commenting upon this situation we said:

"But, to prevent similar confusion in the future, we deem it proper to add that the people of a district are

not to be disfranchised because the ballots are lost or stolen, if they may still be supplied by the county clerk in time to hold the election.''

It is, however, at once apparent that the condition before the court in that case was so very different from the one here presented that what was said in that case can have no application here. In that case, through no fault or inadequacy of the law, the voters in certain precincts were about to be disfranchised by fraud, to prevent which the court said that the clerk might furnish other ballots in place of those that had been lost or stolen. Manifestly this ruling was correct, for if it should happen, through some accident or misfortune or fraud, that the ballots were lost or destroyed on or before the day of the election, the clerk should have the right to supply them, if he could do so in time to hold the election. But, in the case we have, the clerk performed his statutory duty and all the ballots furnished by him were used. There was no fraud practiced by any person connected with the election, nor was the insufficiency of the number of ballots due to accident or misfortune of any kind. The disfranchisement of the voters simply resulted from the failure of the statute to make adequate provision for furnishing a sufficient number of ballots.

The question then is, was the election a free and equal one within the meaning of the Constitution, and if it was not, what should be declared to be the result? Strictly speaking, a free and equal election is an election at which every person entitled to vote may do so if he desires, although in dealing with the practical aspect of elections it could hardly be said that if only a few were prevented from voting the election would not be free and equal in the constitutional sense. The very purpose of elections is to obtain a full, fair and free expression of the popular will upon the matter, whatever it may be, submitted to the people for their approval or rejection, and when any substantial number of legal voters are, from any cause, denied the right to vote, the election is not free and equal in the meaning of the Constitution.

Nor do we think it material whether the cause that prevented persons legally entitled to vote from exercising the right of suffrage was due to some imperfection or insufficiency in the statute regulating the conduct of elections or to fraud, intimidation, violence, bribery or other wrong-doing that prevented a full and free expres-

sion of the will of the people. The constitutional pro-
vision is mandatory. It applies to all elections, and no
election can be free and equal within its meaning if any
substantial number of persons entitled to vote are denied
the right to do so. It would not be competent for the
Legislature of the State to purposely pass a law to pre-
vent or interfere in any manner with the right to hold
a free and equal election as we have defined it; nor
would honesty of purpose in the enactment of a law in-
tended to permit free and equal elections, save it from
condemnation, if in its practical application it prevented
a free and equal election. In short, this constitutional
provision admits of no evasions or exceptions. No
amount of good intention or good faith can be allowed
to defeat its purpose or its meaning. When the question
arises, the single inquiry will be, was the election free
and equal in the sense that no substantial number of per-
sons entitled to vote and who offered to vote were denied
the privilege.

These views in other forms of expression have been
announced by this court in a number of cases. Thus, in
Com. v. McClelland, 83 Ky., 686, it was said: "Elec-
tions are free and equal only when all who possess the
requisite qualifications are afforded a reasonable oppor-
tunity to vote without being molested, or intimidated,
and when the polls are in each county and in each pre-
cinct alike freed from the interference or contamination
of fraudulent voters."

In Early v. Raines, 121 Ky., 439, a number of voters
were denied the right to vote at a special election be-
cause, through ignorance or mistake on the part of the
county judge, a special registration was not held as re-
quired by law for this special election. The court, in an
opinion setting the election aside, said: "That a ma-
jority of the legal voters were given an opportunity to
register and vote is obviously not a free and fair election.
All legal voters should have the privilege and right.
Where it is denied to any substantial extent, it is an in-
vasion of the highest right of the citizens, and tends to
substitute other means of determining the popular will
for elections held by the people. Such course, however
innocent its motive, cannot be too severely discounten-
anced."

We are, therefore, of the opinion that this election
was not a "free and equal election" within the mean-

ing of the Constitution, although the fact that it was not did not result from fraud or wrong-doing on the part of any person concerned in the election. So far as the law under which the election was held was concerned, it was fairly conducted and every person entitled to vote was given an opportunity to do so until prevented by the shortage in ballots at the precincts named.

Not being then a free and equal election, the remaining question is, how, if at all, should this condition be allowed to affect the result as found by the canvassing board? In Cooley's Constitution Limitations, 6th Ed., page 782, it is said: "An election honestly conducted under the forms of law ought generally to stand, notwithstanding individual electors may have been deprived of their votes, or unqualified voters been allowed to participate. Individuals may suffer wrongs in such cases, and a candidate who was the real choice of the people may sometimes be deprived of his election; but as it is generally impossible to arrive at any greater certainty of result by resort to oral evidence, public policy is best subserved by allowing the election to stand, and trusting to a strict enforcement of the criminal laws for greater security against the like irregularities in the future." And the mere fact alone that Judge Cooley has given expression to this opinion entitles it to great weight.

Another view is to hold the election void when it is made to appear that it was not free and equal. It is, however, a serious matter to declare an election held under the forms of law a nullity on account of conditions, from whatever cause they arose, that prevented the free and equal expression of the will of the people, and this course courts are reluctant to pursue if there is any other satisfactory method by which the election can be sustained and at the same time the rights of the complaining party protected.

Yet another view of this question is to count all the voters who have been denied the privilege of voting in favor of the contestant, and if, when this vote is added to the vote received by him, it does not change the result, to declare the election valid upon the ground that he was not prejudiced by the failure to receive the votes that might have been cast for him if opportunity had been afforded. This rule is, of course, not fair to the contestee, as the assumption that the contestant would have

received all the votes that were not cast is too improbable to be reasonable; but, at the same time, its adoption takes away from the contestant the right' to complain, so far as he is affected, that the election was not free and equal.

It is, of course, not to be overlooked that the public are deeply interested in the freedom and fairness of the ·elective franchise, and the mere fact that contesting candidates for office might be satisfied with the result, although obtained by unfair and fraudulent means, would not constitute it a free and equal election. But when an election, involving either persons who are candidates for office or questions submitted to the people, is contested by those who were unsuccessful or who represented the unsuccessful issue, upon the ground· that the election was not free and equal, we think it might be a ·sufficient answer to the contestant to say, ''You were not prejudiced by the condition of which you complain, because if you had received the votes of all those who were denied the right to vote, you would yet be unsuccessful.''

It is true that in Hocker v. Pendleton, 100 Ky., 726, where the clerk failed to furnish the number of ballots required by the statute, and as a result 60 legally qualified voters, out of a voting population of less than 175 in the town in which the election was held, were prevented from voting, the election was set aside by this court upon the ground that it was not ''free and equal in the constitutional sense;'' and that in Early v. Rains, 121 Ky., 439, where as a result of the failure to hold a special registration as required by law a number of voters were prevented from voting, the court set the election aside upon the ground that where the right to vote was denied a substantial number of voters, it was 'not an election within the meaning of the Constitution and laws, although it did not appear that the result of the election would have been affected if all those who were denied the right to vote had voted with the contestants.

The ruling, however, in Hocker v. Pendleton and Early v. Rains has not been adhered to in the later cases and is not in harmony with the weight of authority, which is that before an election shall be set aside it must appear that the result would have been changed if all those who were entitled to vote had voted in favor ·of the contestants. Stewart v. Rose, 24 Ky. L. R., 1759; Motley v. Wilson, 26 Ky. L. R., 1011; Scholl v. Bell, 125

Ky., 750; Harrison v. Stroud, 129 Ky., 193; Ford v. Hopkins, 141 Ky., 181; Skain v. Milward, 138 Ky., 200; Stewart v. Wurts, 143 Ky., 39; Hill v. Motley, 142 Ky., 385; Young v. Roberts, 143 Ky., 511; Butler v. Roberson, 158 Ky., 101; Coggeshall v. Des Moines, 138 Ia., 730, 128 Am. St. Rep., 221; Renner v. Bennett, 21 Ohio St., 431; Swepston v. Barton, 39 Ark., 549; Pickett v. Russell, 42 Fla., 116; Truesdell v. Bryan, 24 Texas Civ. Appeals, 386; Martin v. McGarr, 27 Okla., 653, 38 L. R. A. (N. S.), 1007; Howell v. Pate, 119 Ga., 537; McCray on Elections, Sec. 235.

If an election, as held in these cases, should not be set aside for fraud or bribery or intimidation, if the votes affected by these agencies can be deducted without changing the result, or if the votes prevented from being cast by fraud, intimidation or violence can be added to the minority without changing the result, there seems no sound reason why this rule of subtraction and addition should not be applied to a state of facts such as exists in this case. So far as the effect on the election or the effect on the rights of the parties interested is concerned, it is not material from what cause illegal votes were permitted to be cast or legal voters denied the right to vote. If this result is accomplished by fraud or bribery or intimidation or by mistake on the part of the election officers or by some imperfection in the law, the effect upon the result is precisely the same.

To re-state the rule adopted by this court it is this: If the number of voters that were prevented from voting by fraud, bribery, violence, mistake of the election officers, or imperfection in the law, would be sufficient to change the result if they had been cast for the minority, then the election should be set aside upon the ground that it could not be determined with certainty that the result as certified to by the canvassing board represented the will of the majority. A like conclusion should be reached if the bribery, fraud, intimidation or other cause whatever it may be, has affected the election to such an extent that it cannot be determined by any reasonable method for which side a majority of the legal votes were cast.

On the other hand, if there should be added to the minority votes all the votes that it is clearly ascertained were prevented by any cause from being cast, and this addition would not affect the result as certified by the

board, the election should be upheld upon the ground that the omitted votes did not affect the result or prejudice the rights of the complaining party, and the same conclusion should be reached if the irregularities, whatever they may be, were not sufficient to affect the result.

It may be conceded that all of these methods are open to objection, but when the validity of an election is assailed, the purpose of the courts is to adopt, if practicable and fair, some plan that will save the election and at the same time do justice between the contending parties.

Applying now these principles to the case we have, it appears that there was a majority of 558 votes in favor of prohibition, and that 448 votes were prevented from being cast on account of the shortage in ballots. So that if the contestants should be given the benefit of every vote that was not cast on this account, there would yet be a majority in favor of prohibition, and so their rights were not prejudiced by the fact that the election was not free and equal.

Other minor irregularities occurring in a few precincts are pointed out by counsel, but it is apparent that they did not have any substantial effect on the result of the election. Indeed, it may safely be said, considering the interest manifested, that the election was singularly free from fraud, intimidation or other wrong-doing of the character that so often appears in election contests.

Upon the whole case, our conclusion is that the judgment of the circuit court upholding the election should be affirmed, and it is so ordered; the whole court sitting.