## Middleton v. Poer.

(Decided June 24, 1938.)

(As Extended on Rehearing Nov. 11, 1938.)

CHARLES B. SPICER, FORESTER & CARTER and SAM H. BROWN for appellants.

E. H. JOHNSON, J. C. BAKER, J. B. WALL and GOLDEN & LAY for appellees.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Affirming.

Appellant and appellee were, respectively, nominees of the Republican and Democratic parties at the November 1937 regular election, for jailer of Harlan county.

Appellant won by a substantial majority, and was awarded certificate of election. Appellee in proper time began contest. Appellant counterclaimed. The court after 60 days' hearing of 600 witnesses, concluded from the proof that no legal election had been held, and adjudged the contested office vacant. Defendant below appeals and plaintiff cross-appeals.

Appellee asked for a recount in all seventy-three precincts. This was had in a few, without showing of material difference in results.

Without details we shall undertake to state appellee's allegations of illegal conduct by appellant, other candidates of his party, their friends, relatives and partisans, and appellant's answer and counter charges. The then sheriff of Harlan County, a relative of appellant, of the same political party, and ex-officio member of the County Board of Election Commissioners, with the other member of his party controlled the actions of the board. Prior to the regular election Democratic candidates were compelled to resort to the court to, and did, obtain representation. Thereafter on October 27, without notice to the minority member, the other members arbitrarily removed nineteen of the Democratic officers, and substituted others of their choice, alleged to be friendly partisans.

On November 1, the aggrieved parties again appealed to the court, and the commission was directed to assemble and reinstate those officers who had been removed. This order was ignored, with the result that in some instances those who originally held credentials and appeared for service were not permitted to serve, resulting in an unfriendly and partisan set-up of officers in many precincts.

In many precincts deputy sheriffs and county patrolmen took charge of the conduct of the election, permitting those who were "right" the privilege of voting, but denying "objectionables" the same privilege, in many instances driving them from the polls. It is charged that in some precincts votes were illegally cast by the election officers in "blocks," that is, by "stuffing the box." Many who were duly registered were denied a vote; many who were not registered were permitted to vote.

In other precincts partisan officers had agreed to

omit the requisite signing of a judge's name on the back of the ballot. That this omission, evident on many Democratic ballots, without such omission on ballots of the opposite party, it is charged, demonstrated the success of the plan to some extent. In some precincts deputy sheriffs, county patrolmen and active partisans, concerting with friendly officers, locked the polling room doors for periods of thirty minutes, though voting was going on, not by voters, but by officers and their friends, this prevailing in precincts where the situation seemed favorable to appellee and his party nominees.

In one precinct, as a part of the preconceived general plan, the flooring of a bridge was removed, the purpose being to prevent some fifty or more voters from reaching the polls, except, perhaps, by devious routes, since they resided on the side of the creek opposite the polling place. In some precincts where no booths were provided, voting was above board. In others, with ample equipment, the same thing prevailed to some extent. In some instances voting was done solely by officers or by-standers, though the voter showed no physical disability, or sworn as to inability to read or write. "Chain" voting was alleged, as was "alphabetical" voting. In one precinct twenty persons, whose surnames began with "W" voted in numerical order, as shown by the stubs. Seven "Jones'," one "Jackson" and one "Jarvis" voted in order. Eight whose names began with "C" voted one after the other.

In certain precincts where mining operations were directed, it is charged that employers coerced and intimidated employes, going to the extent of discharging one superintendent because of his activity in behalf of those not favored by employers. Some voted as directed through fear of loss of employment.

The sheriff, a relative of appellant, had about 125 deputies. Twenty-four of these were appointed late in September; eleven late in October. The county judge had appointed about fifty county patrolmen, and many of these officers were present in various polling places armed, and in some instances, when not serving as election officers, engaged in activities not calculated to help those with whom they were not in sympathy. It is also charged that appellant, his friends, helpers, and workers, violated the Corrupt Practice Act, Kentucky Statutes, section 1565b-1 et seq., by the expenditure of large

sums of money, and the dispensing of quantities of whiskey.

In seven or eight precincts State Highway Patrolmen appeared, and beginning as early as 9:30 a. m., up to some time after noon, arrested the election officers, confiscated the election equipment, boxes and ballots, and took them to the county jail where the officers were kept until after nightfall, and the ballots and boxes, until they were taken by the state militia to the clerk's office. These activities stopped the election in these precincts.

As we read appellee's pleadings and brief, in his behalf, it appears that his insistence is chiefly, that due to the illegal acts, as charged in his petition, backed by substantial proof, demonstrates that no legal election was held on November 2.

Appellant in his first paragraph denied the greater portion of the petition, particularly his participation in any of the acts charged, but if done, denying his knowledge or consent. By counterclaim it was charged that the Democratic candidates had formed a committee prior to the election, and appellee contributing, had raised a fund aggregating $30,000, which was used in bribing and influencing voters. It was alleged that this committee had failed, as required by law, to file pre or post-election statement of receipts and expenditures.

In certain named precincts ballots were openly voted for appellee. Votes were cast by those whose names did not appear on the registration lists. Nonresidents of the precinct, and county, were allowed to vote. Some who had been convicted of felonies voted. In many precincts where the Republican candidates were known to be in favor, and where the registration books showed large majorities for them, Democratic officers and workers illegally interfered with the election by force and intimidation, preventing Republicans from voting. In many precincts appellant and his fellow candidates had no representation. There the ballot boxes were heavily stuffed; officers cast illegal votes for appellee; many unregistered names appeared on the stubs, and alphabetical voting was indulged. In some instances alphabetical voters repeated. Some "ghost" voting was charged.

It is noted that while each party charges violation

of the Corrupt Practice Act by the other, each vehemently denies violation, either by themselves, or by others with their knowledge or consent.

The position taken by appellant is in the nature of an admission that many of the infractions of the law, relative to fair and equal elections, were committed, but committed by appellee and his partisans with the full knowledge of appellee. This is particularly stressed with relation to the stolen election equipment, and the raiding of the precincts by the Highway Patrolmen. That in such situation and under such circumstances he should not be deprived of his fairly earned evidence of election. That to do so would not only deprive him of his right, but would result in the disfranchisement of some 17,000 voters of Harlan County, thus permitting appellee, without right, to gain the end he is seeking.

After completion of pleadings, the court adjudged that upon the facts adduced, it was evident that no legal election had been held; declared the office of jailer (and other contested offices) vacant, and entered judgment accordingly. The appeals followed.

At this point, after reviewing more than 200 pages of pleadings and court orders, 1,600 pages of testimony, and more than 200 pages in briefs, we conclude that we can do no better than to adopt the court's opinion upon which was founded his final judgment. In so doing we may say that from our review of the mass of testimony we feel fully justified in the conclusion that there was sufficient evidence upon which to predicate the court's opinion and judgment. If authorities be needed to justify the court's ruling, reference may be had to section 6 of the Constitution; Kentucky Statutes 1596a-12; Hocker v. Pendleton, 100 Ky. 726, 39 S. W. 250, 19 Ky. Law Rep. 135; Wallbrecht v. Ingram, 164 Ky. 463, 175 S. W. 1022; Crockett v. Olive, 247 Ky. 133, 56 S. W. (2d) 702; Scholl v. Bell, 125 Ky. 750, 102 S. W. 248, 31 Ky. Law Rep. 335; Scott v. Roberts, 255 Ky. 34, 72 S. W. (2d) 728; Taylor v. Neutzel, 220 Ky. 510, 295 S. W. 873; Gross v. Ball, 258 Ky. 730, 81 S. W. (2d) 409; Bowles v. Knight, 257 Ky. 640, 78 S. W. (2d) 913; Johnson v. Little, 176 Ky. 505, 196 S. W. 156, Ann. Cas. 1918A, 70; Drennan v. Roberts, 234 Ky. 574, 575, 28 S. W. (2d) 735; Marilla v. Ratterman, 209 Ky. 409, 273 S. W. 69. The opinion follows:

"Generally speaking the charges are that in

many precincts only partial election was held; in other precincts voters were intimidated and election officers interfered with; open voting was indulged in; ballots were marked, illegal votes cast, ballots were not signed by the Judge of the election, 'Chain ballots' were used, precincts were not divided so as to include only the legal number of voters; conspiracy to prevent a fair election, violation of the Corrupt Practice Act, and most every other thing that could occur in an election to make it illegal and unfair.

"It would be too tedious to rehash the evidence of more than 600 witnesses who testified, but this Court will say that there was evidence of the existence of most of the charges, though there is contradiction of some, and other parts were not impressive on this Court. But that both money and whiskey were used to influence voters is proved by witnesses so numerous, we cannot escape the conclusion that that condition prevailed. The evidence that threats were made toward voters that their jobs would be in danger was contradicted, but the evidence by the recipients of money and whiskey which gave the names of those from whom this corrupting influence was received was not contradicted by many of those persons who distributed the whiskey and money. An example of this is Dr. Martin from the Louellen precinct. Dr. Martin failed to refute the testimony that money was paid to voters by him in his office.

"If money and whiskey was used with the knowledge of the candidates, then the charge of violating the Corrupt Practice Act would be sustained, and the beneficiaries of such violation with such knowledge should be denied the right to office. However, notwithstanding this open and almost general use of money and whiskey to corrupt voters, which might constitute circumstantial evidence of knowledge of its use on the part of the candidates, the respective candidates deny any knowledge of it. In this case the Court is willing to and does give the parties the benefit of the doubt such denial might create. But the conclusion is inescapable that money was lavishly expended and whiskey was bountifully distributed to influence voters in this election.

"Laying aside for the moment the unfair and corrupt practices mentioned above, and the other practices disclosed in the record, which are contradicted or denied, we have several other acts performed in many precincts which have been proven and which are neither denied nor disputed, and which in the mind of this Court not only bear upon the fairness, but are of sufficient magnitude to have affected the result of the election.

"First: We see an utter disregard by officers of the circuit court of an order made by that court relative to the selection of officers to serve in various precincts. Such action on the part of the court officers, resulted either in having officers all of one political party in some of the precincts, and in other precincts the election officers arbitrarily chosen to serve, while registered as affiliated with one party, were actually and openly supporting the opposite political party. This disregard for an order of the circuit court was carried so far that perhaps arrests were made of some who were entitled to serve as officers of the election by the very officers of that court which issued the order.

"Again, in another precinct, (Black Mountain No. 10), in which there were some 500 voters registered, no vote was cast in the election for the reason that all the ballots, ballot boxes and other election equipment were stolen the night before the election at the point of a pistol by some person whose identity was not established. The person who committed this violence was not connected with any of the parties to these actions so far as the proof shows. This entire precinct was disfranchised, and no vote was cast in that precinct in this election.

"Then again in eight other precincts, in which there was a registered vote of some 4,200 persons, state patrolmen began before noon on election day to arrest all the election officers in these precincts and to confiscate all ballot boxes, ballots and election equipment; they proceeded with these election officers and election paraphernalia to the Harlan County jail, the election equipment being on one automobile and the officers in another. There both officers and ballots and boxes were deposited until the former were released and the latter taken

charge of by the state militia. Some time during the night of the election these ballots and boxes were delivered by the militia to the custody of the county court clerk. Thus, in these precincts, the polls were closed hours before the time provided for closing, and a great per cent of the registered voters in these precincts were deprived of the right to vote. Nor is this court able to determine from the evidence the integrity of the ballots that were actually cast in these precincts, because they passed through so many hands before they finally reached the custody of the county court clerk. So far as the record shows this action on the part of the State Patrolmen in this wholesale arrest and confiscation of the ballots and boxes was without warrant from any Court, and there is serious doubt that any offense was being committed in the presence of the patrolmen which should have caused an arrest. Certainly, if the arrest of the officers of election was legally justified, there was no justification of a seizure and confiscation of the ballots and other election equipment and a removal of them from the precincts.

"This Court cannot distinguish much difference, if any, between the action of that person who confiscated the ballot boxes, etc., in the Black Mountain Precinct No. 10, above mentioned, and the action of the State Patrolmen in interfering as this record shows they did interfere. This action not only deprived many voters of the privilege of casting their votes, but made uncertain the integrity of those ballots which had been cast, and in this manner affected something like 4,200 votes. These 4,200 votes added to the 500 Black Mountain Precinct No. 10, total between 4,500 and 5,000 votes affected by the acts of violence herein mentioned.

"These enumerated acts, all uncontradicted, considered together with evidence of the vast array of bribery and intimidation, some disputed and some undisputed, as shown by the entire record, is convincing that the election in Harlan County on November 2, 1937, was a most unfair one. It may be that neither the contestant nor the contestee was responsible, and that the over-zealousness of their friends or the vindictiveness of their enemies produced the conditions, but however it may be, from

an inspection of the whole record, this Court is unable to determine that either the contestant or the contestee was fairly elected to the office of jailer of Harlan County.

"Such being the conclusion of the Court, it is the judgment of the Court that there was no election of jailer in Harlan County, Kentucky, on November 2, 1937, and such office shall be deemed and is hereby declared to be vacant as if the contestee had refused to qualify."

The court below adjudged the costs in this case and companion cases against appellants. They were contestees below. Proper objections were made to the entire judgment and the question of costs has been presented here, it being insisted that the appellants should not be required to bear the entire cost. Counsel relies on the case of Burke v. Greer, 197 Ky. 555, 247 S. W. 715, 717, as authority for a proper distribution of the costs. We think the court erred in adjudging costs. Cases cited by appellees (contestants below) are not in conflict with Burke v. Greer, supra. In that case, after setting out the status of the parties, we said [page 717]:

"In such circumstances the parties should have been required to pay their own costs in the court below, and upon return of the case the judgment will be so modified, and, this having been done, the costs of the appeal will be divided equally between them, and it is so ordered."

We adopt that rule with respect to the costs in these proceedings, same to apply in Cawood v. Ball, and Howard v. Wall, infra.

The judgment is affirmed on original and cross-appeal.

The whole court sitting, except Judge Clay.