### Ford v. Hopkins.
### Bowles v. Childers.
### Taylor v. Newsom.
### Scott v. Williamson.
### Flannery v. Riddle.
### Hatfield v. Raines.
### Burris v. Staton.

(Decided December 9, 1910.)

## Appeal from Pike Circuit Court.

Election—Contesting an Election—Fraud, Bribery, &c., Shown —Corruption Fund Distributed—Conclusion.—In subsection 12 of section 1596a, Ky. Stats., regarding the contesting of elections as to certain offices, it is provided: "In case it shall appear

from an inspection of the whole record that there has been such fraud, intimidation, bribery, or violence in the conduct of the election that neither contestant nor contestee can be adjudged to have been fairly elected, the circuit court, subject to revision by appeal, or the court of appeals finally, may adjudge that there has been no election. In such event, the office shall be deemed vacant with the same legal effect as if the person elected had refused to qualify." Held, where it was shown in an election contest that one of the political parties had a corruption fund of $14,000.00 for use at the polls on election day, which was sent out to the various precincts and none of it ever came back to those who sent it there, we think the use of this large sum of money on election day, with no testimony that it was used for legitimate purposes, itself justifies the conclusion that the bribery was so widespread and universal as to make it impossible to tell who was legally elected.

2. Same—Dangerous Enemy.—There is no more dangerous enemy to government by the people than the crime of bribery. The corrupt use of money not only saps the moral integrity of the weak and vacillating, but it discourages the upright and strong. A good citizen cannot well be blamed if he ceases to be interested in an election where his vote can count for nothing, or be offset by the vote of the purchased chattel of the political corruptionist.

BUTLER & MOORE, C. C. BOOLES, J. M. BOWLING, ROSCOE VANOVER, A. F. CHILDERS and C. B. WHEELER for appellants.

E. D. STEPHENSON, J. E. CHILDERS, W. H. FLANNERY, F. W. STOWERS, WILLIS STOTSON and N. J. AUXIER for appellees.

OPINION OF THE COURT BY CHIEF JUSTICE BARKER— Affirming.

At the general election for 1909 there was to be filled, for Pike county, the following offices: Circuit court clerk, county judge, county court clerk, county attorney, sheriff, county assessor and superintendent of common schools. The appellant, J. W. Ford, was the regular nominee of the Republican party for the office of county judge. The appellee, N. T. Hopkins, was the nominee of what was called the Fusion ticket for the same office. The election resulted in an apparent victory for the Republican party; on the face of the returns, all of its nominees received majorities ranging from two hundred and thirty-five to forty-six. Certificates of election were issued by the election commissioners to these various Republican candidates, and thereafter the Fusion candidate for each office instituted an action in the Pike cir-

cuit court contesting the validity of the election of his opponent. The grounds of the contest were similar in each case, and by consent the actions were heard together, and the evidence taken in one was read in all. Upon the trial of the cases the circuit judge held that there had been such irregularities, fraud and bribery indulged in by both parties that it could not be fairly ascertained which side had received the most legal votes, and entered a judgment setting aside the election as invalid. From this judgment an appeal has been prosecuted in each case. As they involve the same questions, we will consider all of the cases together.

There were various grounds of contest set out in the pleadings, but by the principal one it was charged that the successful party had secured more votes by bribery than it had received majority, and that of the honest votes cast the contestants had received a majority and were entitled to the certificates. The trial judge held, and in this we agree, that there was not sufficient evidence adduced to show that the contestants received a majority of the legal votes cast, and refused to adjudge them elected; but, as said before, held that there was evidence of such bribery as made it impossible to tell who had been elected by the legal votes cast, and vacated the election. The correctness of this judgment is the question for adjudication here.

The appellants, who were the contestees below, urgently insist that there was a failure to state in the petition a cause of action for setting aside the election. To this we cannot agree. The pleadings are somewhat voluminous and prolix, but in our opinion the petition contains allegations sufficient to warrant the judgment vacating the election if the evidence supports the issues presented.

We will now proceed to consider the various grounds of contest presented for adjudication. Among these it is insisted that the board of election commissioners were guilty of fraud and irregularity in the appointment of election officers in this: In various precincts where it was considered necessary or essential to party success that the Republican party should have a Republican appointed as sheriff, all of the sheriffs were of that denomination. It may be true that the election commissioners in the appointment of the election officers did seek to give the Republicans a political advantage in the manner complained of, but we have heretofore held that, under the statute,

this was a matter within the discretion of the election commissioners, and if upon the whole there was an equal division of the officers between the parties, we would not enter into an inquiry as to whether the commissioners should have appointed a Republican sheriff and a Democratic clerk or a Democratic sheriff and a Republican clerk at any given precinct; that the statute was complied with when there was an equal division of the officers, each party having one of the judges and one of the other officers, sheriff or clerk, at each precinct.

Another ground for contest is that the Republican managers induced one Brown to become a candidate as a Democrat for the office of county judge, and to adopt as his emblem the usual emblem of the Democratic party, a game cock; it being said that this was done so as to mislead the illiterate Democratic voters who, being in the habit of voting under the emblem of their party, would do so in this case when they saw the rooster on the ballot, and in this way their votes would be diverted from the Fusion ticket to the manifest advantage of the Republican candidates. There is no doubt that this charge was proved, but we cannot say that this was an illegal advantage, however questionable it was in morals. An election is a means furnished the people by the State to select their public servants, and we do not see how the people are injured or deprived of any right when an opportunity to make a choice from all the candidates is fairly presented to them. Those who voted for Brown under the Democratic emblem must be presumed to have done so voluntarily, in the absence of any evidence to the contrary, and this was the exercise of a legal right of which no one may legitimately complain.

The only other ground of contest remaining to be discussed is that of bribery and certain irregularities at the polls on election day which enabled those who were engaged in the corruption of the voters to succeed in their unlawful practices. The learned trial judge delivered a written opinion in this case, in which he sets forth his conclusions of facts as to the practices of both parties in the matter of bribery on election day. These conclusions are fully supported by the evidence, and we will reproduce them here, in the following excerpt, as a part of our opinion:

"Complaint is made by the plaintiffs especially of Peter precinct, Lower Elkhorn, Coal Run, Brushy, Knox and Freeburn precincts. It is shown that in Knox pre-

cinct over one-half of the entire vote was voted openly without the voters being sworn as to their inability to mark their ballots. In Peter and Brushy precincts the election was held in school houses; at Coal Run the booths were placed in a barn lot, and there is more or less testimony tending to show that the booths at all these places were not sufficiently isolated and properly protected from outside observation. At one or two precincts the curtains protecting the booths were down, at least a part of the time, but his was probably by accident. At Peter precinct the bottom dropped out of the ballot box, and it was put upon the floor and then the ballots put in it; but no fraud seems to have resulted therefrom. Such irregularities are liable to occur more or less in a county election and should not be held to vitiate it and defeat the will of the voters, unless it is plain that by reason thereof their will has been defeated. Such things, however, afford an opportunity for successful bribery and are to be considered in connection with such a complaint. It appears that the Republican candidates, others perhaps uniting with them, were assessed and paid to their campaign committee about $14,000. It is uncertain how much the Citizens ticket had, but probably as much as $6,000. These amounts to be used in an election in Pike county, although there are twenty-five precincts, seems uite unnecessary for the ordinary expenses of candidates in an election. It is shown that on the day of the election, or shortly before, the following sums were sent out by the defendants or their campaign committee to the following precincts, to-wit:

"Six hundred dollars to South Pikeville; $1,400 to Shelby; $350 to Marrowbone; $700 to Lick; $150 to Lower Johns Creek; $200 to Pond; $1,500 to Peter; $150 to Upper Johns Creek; $750 to Forks; $600 to Upper Elkhorn; $650 to Blackberry; $500 to Lower Elkhorn; $300 to Caney; $450 to Coal Run; $800 to North Pikeville; $150 to Meat House; $600 to Burning Fork; $900 to Brushy; $700 to Knox; $581 to Coeburn Fork; $300 to Grape Vine; $1,000 to Freeburn; $450 to Ford's Branch; $300 to Hellier, and some amount to the remaining precinct.

"The Citizens ticket also had money at most, if not all the precincts on election day. At Shelby, to which the Republican committee had sent $1,400, $300 was added, making $1,700 there, making $3,400 in all at this one precinct for use on election

day. It is urged that bribery is not proven, and that it is not shown to such an extent as to affect the result. The voter who is bribed can protect himself from testifying to it, and so can the one who bribes him, but the use of so much money cannot fail to impress one that both sides in this election engaged in wholesale bribery. The irregularities in conducting the election enumerated above gave opportunity to do so. The plaintiffs, in their petitions, charge that hundreds of votes were bought for the defendants. The defendants, in their answer, allege that about one thousand voters were bribed by the plaintiffs. This is admitted in the main by the plaintiffs, but they allege defendants did it. The money used on the day of the election and none of which was returned makes it probable that each side is correct in its charges, and than each was the beneficiary, more or less, of this wholesale bribery. It is urged, however, that in order to set aside the election it must be shown specifically that bribed votes were cast sufficient to change the result certified by the election officers. It is true that the vote of a precinct of a county should not be thrown out upon a presumption. To do so would disfranchise the honest electors, and the question to be arrived at, if possible, is, who received the majority of legal votes? Any fraud is not to be presumed. If one claiming to be elected was not a party to the fraud, then he is not affected unless it affects the result. As said by Justice Hobson in Motley, v. Wilson, 26 Ky. Law Rep. 1011: 'The policy of the law is to sustain elections.' All of our rights, however, reach back to and are based upon a free ballot, because the sovereignty is in the people. If the source becomes muddy, what flows from it will also be contaminated. Hence it follows that whenever fraud or bribery so far enters into an election that it is impossible to tell who has been elected by the legal votes, it is not to be upheld. Specific cases of bribery are, however, shown at many precincts. In one a worker for the defendant and a deputy sheriff took the money to the precinct and when questioned protects himself with a refusal to answer. In Freeburn precinct even some of the officers of the election had some of the money. It is shown that $33 was given to eleven men, which from the circumstances shown must have been for their votes. In Coal Run, where the booths were in the barn lot, about $400 was given to men who promised to vote the Republican ticket. At Big Creek it is shown that thirty men received money and five or more at Coal Run.

In Knox precinct the workers for the defendants' ticket refused to testify, while others proved they saw them giving money to voters. In Peter precinct, that has but 260 voters, and where the $1,500 sent by the defendants' committee had been made up to $2,000, it is proven workers were watching to see how the voters voted, giving money to them and sticking it in their pockets. At Freeburn it is shown the workers for the defendants were located in a little house near the poll, and that the voters were constantly going in and out of it. One side alone in this precinct had one thousand dollars. At Brushy, to which $900 had been sent and which was augmented to $1,005 at two o'clock in the afternoon, because the $900 had given out, opportunity is shown for the use of it. This is true at the Forks, where the defendants had $750. At Lower Elkhorn the workers for the defendants, who had $500, are shown to have been trying to see how the voters voted. At Caney, where the defendants had $300, bribery is shown upon both sides. This is also true at Shelby. It is also claimed that the stub books show that as. to seven precincts a ballot had been extracted from each of them and there is some such appearance upon inspection of them; and it is claimed that these ballots were marked upon the outside, then taken by the voter into the voting place where he obtained another blank ballot and then voted the ballot that had been marked outside and brought out with him the blank ballot for another voter, and that thus voters could be bought with impunity. It is impossible to tell the extent this was done, but it is shown that one voter was caught with such a ballot. McCarry on Elections, section 523, lays down the rule that the entire vote of the county or precinct should not be rejected, except in an extreme case, and undoubtedly this is a safe rule; but our Constitution guarantees a free and equal election, and the law requires that if it appear from the entire record there has been such fraud or bribery in the conduct of the election, although not perpetrated by the candidates, that neither the contestants nor contestees can be adjudged to have been fairly elected, that such offices be declared vacant. Such wholesale bribery and fraud is shown in these cases that the court feels bound to follow this rule. The wrong-doing exists to such an extent that it is impossible to tell who was fairly elected. It, therefore, adjudges that the election in question was void and that the offices of circuit court clerk, county judge, county attorney, county court clerk,

sheriff, assessor, and common school commissioner of Pike county are vacant.''

The foregoing statement of facts is more than conservative. No one can read this record without being convinced that both parties entered into the election with the determination to bribe enough voters to carry it. No sort of effort at concealment was made. In several precincts, during the whole day, money was paid openly without seeming fear of arrest or punishment; and the evidence conduces to show that the prevailing party bribed several times as many voters as its highest candidate received majority. We do not mean to intimate that the managers of the Fusion ticket were less guilty than those of the Republican ticket; each side spent all the money it could raise for the purpose of bribing voters; morally and legally they are equally guilty. But because the losing party was as guilty as the prevailing party is not a sufficient reason for upholding a corrupt election. There are no set-offs or counterclaims in crime. It it true, the courts are disposed as far as possible, to uphold popular elections and not to set them aside for light and trivial causes, if it can be fairly ascertained that the fraud or irregularities occurring did not affect the result. In other words, if it can be ascertained with reasonable clearness that a majority of the legal votes have been cast for the apparently prevailing party, the election will not be disturbed for mere irregularities or sporadic frauds which do not effect the result. But in this case no fair and impartial mind, after reading the record, can say with any reasonable certainty which side received a majority of the legal votes cast. In subsection 12 of section 1596a, Ky. Stats., regarding the contesting of elections as to certain offices, it is provided: ''In case it shall appear from an inspection of the whole record that there has been such fraud, intimidation, bribery or violence in the conduct of the election that neither contestant nor contestee can be adjudged to have been fairly elected, the circuit court, subject to revision by appeal, or the Court of Appeals finally may adjudge that there has been no election. In such event the office shall be deemed vacant, with the same legal effect as if the person elected had refused to qualify.'' The case at bar comes squarely within the purview of the foregoing statute, which was enacted by the Legislature for the very purpose of invalidating such elections as the one under consideration. The object of the statute is to

enable the courts to deprive the guilty of the fruits of victory, where is can not be said from the evidence which side received a majority of the legal votes cast; the Legislature intended to take away the incentive to fraud and bribery by depriving the beneficiaries of the profits of wrong-doing. It is a most important statute, and should be upheld and enforced in every case which falls within its letter and spirit. Stewart v. Rose, 24 Ky. Law Rep. 1759; Wilkins v. Duffy, 114 Ky. 11; Orr v. Kevil, 124 Ky. 720; Scholl v. Bell, 125 Ky. 750.

For the appellants it is insisted that there was not sufficient evidence to show the specific number of voters bribed, or that the number so corrupted is equal to, or greater than the majorities received by them on the face of the returns. If by this it is meant that the names of the voters bribed are not given, or their precise number set down, this may be true. But it must be borne in mind that this is not a criminal prosecution, where the guilt of the defendant must be proved to the exclusion of every reasonable doubt; and where he may refuse to testify without any comment on his silence. It was shown, without any pretense of contradiction, that the Republican party had a corruption fund of about fourteen thousand dollars for use at the polls on election day. This money was sent to the various precincts and placed in the hands of the trusted campaign workers, and none of it ever came back to those who sent it there. All day long every indication that bribery was being carried on was manifest at most of the precincts, and we think the use of this large amount of money on election day, with no testimony that it was spent for legitimate purposes, itself justifies the conclusion, under the circumstances of this case, that the bribery was so widespread and universal as to make it impossible to tell who was legally elected.

In the argument at the bar it was stated, and not denied, that although fraud and bribery were as openly carried on at the election under consideration and with as little apparent desire for concealment as religious services are usually conducted in churches, not one of the guilty parties has ever been indicted, nor has there been taken any other steps looking toward their punishment for their open and brazen violation of the statutes regulating elections. One party was just as guilty as the other, the difference in their guilty conduct being only one of degree, not of quality. There is no room in this

case for the philosophy of the political casuist, who, having accepted money from both sides for his vote, justifies his finally voting for the one who paid the smaller sum by saying that he desired to uphold the party which was least corrupt. There is no more dangerous enemy to government by the people than the crime of bribery. The corrupt use of money not only saps the moral integrity of the weak and vacillating, but it discourages the upright and strong. A good citizen can not well be blamed if he ceases to be interested in an election where his vote can count for nothing or be offset by the vote of the purchased chattel of the political corruptionist. That such practices as this record discloses can be carried on with impunity, is a sad commentary on the want of efficient enforcement of the laws in the community where they took place.

A careful reading of this record leaves no doubt in our minds that the statement of facts found by the trial judge is more than sustained by the evidence; and this being true, under the statute it must follow that his judgment in each of the cases involved on this appeal must be affirmed, and it is so ordered.