## Taylor v. Nuetzel et al.

(Decided June 14, 1927.)

### Appeal from Jefferson Circuit Court (Chancery Branch, First and Second Divisions).

1. Elections.—In election contests, amended petition, alleging excessive expenditures in violation of Corrupt Practices Act (Ky. Stats., sections 1565b-13—1565b-18), held properly stricken either as unnecessary or as stating new ground of contest, after time prescribed by section 1596a-12.

2. Elections.—Election contestant may amend petition after time prescribed for filing it by Ky. Stats., section 1596a-12, to enlarge grounds of contest, or make it more definite and certain, but cannot bring in a new ground.

3. Elections.—Under Ky. Stats., sections 1565b-6, 1565b-11, 1596a-12, election contestant or contestee may avail himself of any new ground for contest, or counter-contest, disclosed by candidate's post election expense account, by amended petition filed within 10 days after filing of such account, though after time prescribed for stating grounds of contest.

4. Elections.—Driving of election workers from precincts by actual or threatened violence and assaults on election officers and voters is defiance of Constitution, section 6, guaranteeing free and equal elections, though involving only 5 of more than 700 polling places, and of slight effect on result.

5. Elections.—City and county offices should be vacated by declaring election of incumbents invalid only when such duty is clear and the remedy unmistakable.

6. Elections.—Where conspiracy existed to place certificates of election in hands of persons not entitled to them, and was so consummated as to render it impossible to determine that they were fairly elected, and court cannot determine from evidence, with every reasonable presumption therefrom, what result of election would have been but for conspiracy, it is court's duty to set election aside.

7. Elections.—Polling of precincts by paid workers in employ of party organization, before and after regular and supplemental registrations, for purpose of seeing that those entitled to register did so, and ascertaining who had since become eligible to vote, held proper.

8. Elections.—In election contest, evidence held to show that many names of persons not entitled to vote were placed on registration books for purpose of having impostors vote under such names at election.

9. Elections.—In election contest, evidence held to establish conspiracy among persons in active charge of contestees' campaign to leave on registration books names which should have been stricken therefrom for purpose of having illegal votes cast at election.

10. Elections.—There can be no excuse for purgation officers' failure to execute notice on challenged voters in way provided by Ky. Stats., Supp. 1926, section 1486b-17.

11. Elections.—It is purgation officers' duty, under Ky. Stats., Supp. 1926, section 1486b-17, to strike from registration books names of those no longer entitled to be registered, as well as those illegally registered at last regular and supplemental registration.

12. Elections.—It is duty of all officials having anything to do with elections to attempt honestly and faithfully to see that everything possible is done to prevent casting of illegal votes.

13. Elections.—In election contest, evidence held to establish consummated conspiracy to have impostors vote under names wrongfully on registration books.

14. Elections.—Expenditures of $140,000 for election of party candidates in city of Louisville held excessive, in violation of Corrupt Practices Act (Ky. Stats., sections 1565b-13—1565b-18).

15. Elections.—Laws regulating expenditure of money in elections, such as Corrupt Practices Act (Ky. Stats., sections 1565b-13-1565b-18), should be strictly enforced.

16. Elections.—Expenditures for registration and permanent equipment of party headquarters are not properly chargeable against candidates at general election, in ascertaining whether election expenditures were excessive, in violation of Ky. Stats., sections 1565b-13—1565b-18.

17. Elections.—Evidence held not to show voting of impostors by negro political club with 1,000 members, where candidates of their party received only 255 votes as against 5,686 for their opponents in precincts to which bulk of proof related

18. Elections.—That workers of election contestants' party did what they could to get impostors to vote held no defense; such conduct not justifying or excusing like practices on contestees' behalf, and being additional reason for setting aside election for inability to determine fair result.

19. Elections.—Where there was so much fraud that it is impossible to separate fraudulent from valid votes, mathematical rule should not be applied and contestees allowed to retain offices.

20. Elections.—Election wherein legal voters are deprived of right to vote because impostors have already voted for them is not "free and equal," within Constitution, section 6.

21. Elections.—Elections wherein challengers are not given opportunity to be heard, impostors crowd polls and are allowed to vote and violence is practiced and threats made, is not free and equal, within Constitution, section 6.

22. Elections.—Candidates' acquiesence in, or approval of, campaign committee's action in leaving management of campaign to persons responsible for fraudulent conspiracy, is not sufficient ratification thereof, within Constitution, section 151, providing that person whose election is procured by unlawful use of money, fraud, intimidation, etc., shall be held responsible for other's acts ratified by him.

23. Election.—Where court cannot determine from inspection of entire record that any candidate was fairly elected, because of fraud, intimidation, bribery, or violence, it is its duty, under Constitution, sections 6, 151, and Ky. Stats., section 1596a-12, to adjudge that there was no election.

24. Elections.—In conduct of election, time should always be given to investigate right of challenged persons to vote.

25. Elections.—Unauthorized persons should not be allowed in polling places, and party precinct captain or outside worker is not entitled to enter polls, except on officers' invitation when his presence is needed for lawful purpose.

26. Elections.—No greater number of voters should be allowed in polls than there are booths to accommodate them.

27. Elections.—When voter is challenged, no further voting should be allowed until his case is disposed of.

28. Elections.—Evidence of violence against and intimidation of party workers, election officers, and voters, and voting of impostors, held to show that incumbents of offices were not fairly elected, and require adjudication that there was no election.

DAVID R. CASTLEMAN, ALLEN P. DODD and LAWRENCE J. MACKEY for appellant.

ARTHUR B. BENSINGER, HARRIS W. COLEMAN, WALTER S. LAPP, WM. F. CLARKE, JR., HENRY J. STITES and HERMAN G. HANDMAKER for appellees.

OPINION OF THE COURT BY JUDGE LOGAN—Reversing.

This case, and its 33 companion cases, involve the determination of a contest of the 1925 election for city offices in the city of Louisville, and county offices in the county of Jefferson. These cases were heard together in

the circuit court and disposed of by the chancellors in one joint opinion. The petition in each case was dismissed by the judgment of the chancellors. The contestants, who were the candidates of the Democratic party at said election, are the appellants on this appeal, and contestees, who were the candidates of the Republican party at the same election, are the appellees.

The basis of the contest as set up in the original petition was that a conspiracy was entered into by persons interested in the election of appellees, the object of which conspiracy was to procure their election by fraud, intimidation, and violence; and that the conspiracy was consummated and as a result thereof appellees obtained certificates of election. The details relating to the formation and execution of the conspiracy were set out at length in the petition. The answer of appellees denied either the existence or consummation of a conspiracy. The answer was filed December 5, 1925. On March 27, 1926, the appellants offered and were permitted to file an amended petition in which it was alleged that appellees violated sections 1565b-13 to 1565b-18, Ky. Stats., which is a part of what is known as the Corrupt Practices Act, in that they expended greater sums of money in procuring their election than were allowed by said sections, or that greater sums of money than those allowable under these sections were expended by others in their behalf with their knowledge. Upon final hearing the chancellors concluded that the amended petition should not have been allowed, as it came too late. It was stricken by the judgment of the chancellors. The ruling of the chancellors was correct. Grounds of contest must be set out in a petition filed within the time prescribed by the provisions of section 1596a-12, Ky. Stats., and the contestant must state all of his grounds of contest within the time so prescribed with the exceptions herein noted. He may amend his petition to enlarge the ground or grounds of his contest or to make it more definite and certain, but he must maintain in his amendments his connection with his original ground or grounds of contest. No new ground may be brought in.

It is suggested in argument by counsel for appellants that the post-election expense account of a candidate need not be filed until after the day for instituting a contest has passed, and that by the provisions of section 1565b-11, Ky. Stats., it may be alleged in the pleadings in a contest

case that the provisions of the Corrupt Practices Act have been violated by the candidate or by others in his behalf with his knowledge. It is argued that a contestant cannot set up in his petition any violation of the law shown by the post-election expense account unless he may bring it in after such statement has been filed. This is true because section 1565b-6, Ky. Stats., allows 30 days after the election in which to file the post-election statement. Considering section 1596a-12 in connection with section 1565b-6 and section 1565b-11, we have reached the conclusion that a contestant, or a contestee for that matter, may avail himself of any new ground of contest or countercontest which may be disclosed by the post-election statement, but in doing so he must file his amendment within ten days after the post-election statement has been filed.

The amended petitions in these cases charged the excessive expenditure of money in violation of the sections of the Corrupt Practices Act aforesaid. If it added anything to the original petition, it was a new ground of contest, and therefore not allowable under the law as above construed. If it added nothing to the original petition, it should not have been filed.

The chancellors found no basis for the charge made in the petition that appellees took part in the conspiracy. The evidence, according to the findings of the chancellors, did not disclose that appellees had any part in the conspiracy, or that they had any knowledge of the conspiracy, or the execution thereof, or of any attempt at its consummation in whole or in part. We agree with the chancellors in that conclusion. We think it exceedingly doubtful whether appellees know at this time all of the things which were done by their lawless partisans to bring about their election.

The chancellors also found that the Republican campaign committee—that is, the committee nominally in charge of the campaign—had no knowledge of the conspiracy or the acts of the conspirators, and we accept the findings of the chancellors as correct on this point. If the Republican campaign committee sinned, it was through omission and not commission.

The chancellors found that the charge of bribery was not sustained. If it is not bribery to employ, by wholesale, impostors to vote the names of the dead, the absent, the fictitious, and the real, and the paying of such im-

postors for so doing does not constitute bribery within the meaning of our laws, the finding of the chancellors on this point is correct. The nature of this case makes it unnecessary for us to determine whether the hiring and paying of impostors to cast illegal votes in an election is bribery.

The chancellors found from the evidence, and pointed out certain acts of violence and intimidation. A repetition of all the acts of violence and intimidation disclosed in the evidence is deemed unnecessary, but we call attention to some of the happenings in certain precincts which were unseemly, unfair, and unlawful. Members of a negro Democratic club were driven away from precincts where they had been assigned as workers through acts of actual violence or threatened violence. They left the precincts and were not particular about the manner of their going. In one precinct a negro Democratic election officer was first threatened and later called outside of the voting place, assaulted and knocked down, shot at, and otherwise mistreated. Another was struck from behind, knocked down, and his Democratic badge taken from him. Another was assaulted on the way from the polls to his dinner. In another precinct a white Democratic worker was knocked down. In some of the precincts the shooting of pistols occurred more or less frequently. A white voter in one of the precincts inhabited almost exclusively by negroes was assaulted by a police officer and dragged from the line where he stood for the purpose of proceeding into the polling place, although it was shown that, when this was called to the attention of the police authorities, he was promptly removed from the polls and another officer assigned to that duty. There were other scattered acts of violence and some threats calculated to intimidate, but on the whole the election was orderly so far as outward appearances went.

The outstanding acts of violence and intimidation were referred to by the chancellors in their opinion, and on this point they said:

"The foregoing is the story of violence and intimidation found in the record. Few as these episodes are, involving only 4 or 5 polling places out of more than 700 in the city and county, and slight as may have been their effect upon the result of the election, they cannot be ignored. If party workers,

peaceably engaged in their lawful tasks, are to be
frightened away by threats or actual assaults, if an
election officer is to be enticed from the polls only
to be set upon by a gang of ruffians and to be so mis-
treated so as to be unable to return to his post, then
the constitutional guaranty of free and equal elec-
tions is defied. The lawless spirit shown in the hap-
penings above recounted was doubtless a by-product
of the lawlessness displayed in the same sections of
the city (inhabited almost exclusively by colored
people) in the bold and criminal attempt to pollute
the ballot boxes with false ballots, an attempt which
is described below.''

The conclusions of the chancellors on this point meet
with our concurrence. Those who by intimidation, threats,
acts of violence, or other means will drive from the polls
those of an opposite political faith because they do not
wish their acts observed, will stuff ballot boxes, vote re-
peaters, tolerate bribery, and allow any other crime
which in their mind will aid their cause or hurt those who
oppose them. Considering further evidence of the con-
summation of the proven conspiracy, the chancellors
said:

''As to the charge of illegal voting, the evidence
leaves no doubt whatever that there was a scheme,
concerted by an inner circle of 'practical' men in the
Republican organization, to get into the ballot boxes
a sufficient number of false Republican ballots to
insure the seating of the Republican candidates, no
matter what might be the result of the ballots law-
fully cast. There is not a word of evidence that the
Republican candidates or the Republican campaign
committee, or any one of them, had any knowledge of
this scheme, and, as stated above, it was admitted by
counsel for plaintiffs in argument that these persons
were ignorant of what was being done. But that the
scheme was formed and was carried out in part, at
least, cannot be seriously questioned. It is admitted
by defendants' counsel that approximately 500 il-
legal votes were cast and the proof shows that the
number was larger than that. These were not ballots
of qualified voters cast in an illegal manner, through
ignorance or mistake. They were ballots cast by per-
sons not entitled to vote at all, cast chiefly by hired

impostors, impersonating registrants whose names were lawfully put upon the register a year earlier, but who had meanwhile lost the right to vote in the precinct where registered by death or removal therefrom. There were a few who voted twice and some where impostors voted the names of legal voters. Without other proof, the mere fact that so large a number of false ballots was cast shows, of itself, that there was a concerted scheme to procure them. Things of this kind do not happen spontaneously. They are the product of a plan. But there is other proof. It is not necessary to accept all of the items of evidence offered in support of the claim of conspiracy. Some of them are, perhaps, questionable. But there is enough that is unquestionable to establish the existence of the conspiracy claimed, a conspiracy to undermine the very foundation of popular government. No condemnation can be too severe to characterize such treason against the very spirit of our institutions."

The white heat from the hot indignation of the chancellors at the crimes against the electorate of their proud city proves that courts are yet free from the contaminating influence of the corrupted and corrupting politician who knows little of, and cares less for, the history of our country and its free institutions. He little considers that in such practices he is loosening the winds and that he himself along with all of his fellow citizens will sooner or later reap the whirlwinds which no man can control. He litle cares, and, perhaps, he does not know, that he is unleashing a power, which should be restrained, which may pull to earth and destroy all that upholds our heritage of freedom and which will drag forth from the cesspools of evil, forces which will cover the land with their iniquity.

We have gone through the many thousands of pages which make up this record, and our investigation has been painstaking and careful, in an effort to find out whether the chancellors were justified in the searing language which they used to characterize the conduct of those falling under their condemnation. It is a serious and solemn thing to strike the insignia of office at one fell swoop from those governing a city and county. It should be done only when the duty is clear and the

remedy unmistakable. If there was a conspiracy to place in the hands of appellees certificates of election and that conspiracy was so far consummated as to render it impossible for us to determine that appellees were fairly elected, and if, from the evidence and every reasonable presumption arising therefrom, we cannot ascertain what the result of the election would have been if there had been no conspiracy, a duty is imposed upon us which we cannot shirk or evade. This brings us to a consideration of the evidence showing or tending to show the existence of the conspiracy and the fruits thereof.

In the summer of 1925 those within the Republican organization caused a most careful poll of the city to be made by paid workers. By this poll the names of those who were registered in 1924 and who had thereafter died or moved away were ascertained, as well as the names of those who had moved into the precinct, had become of age, or who had otherwise become entitled to register. The obtaining of this information was in all respects proper, as it was needed for two purposes. One purpose was to enable those having charge of the matter to see that those entitled to register did not fail to do so, and the other purpose was for use in the purgation proceedings so that the names of those who had become disqualified since the 1924 registration might be stricken from the registration books. The polling of the precincts continued after both the regular and supplemental registration. The evidence discloses that the polls were carefully and accurately made. This was legitimate, as it enabled those interested in the election of appellees to keep track of those who had become ineligible to vote after the regular and supplemental registrations. We mention these things to show that those in active charge of the Republican organization had in their possession full and complete information as to the names of those on the registration books who were not entitled to vote. There can be no objection to this, but it becomes a circumstance tending to show that the information was not used legitimately, although there was such an opportunity for its use in the purgation proceedings.

It is charged by appellants that many names were placed on the registration books at the supplemental registration which were the names of persons having no right to vote, and that these names were so placed on the registration books for the purpose of having impostors vote the names at the regular election. There is consid-

erable evidence that such names were placed on the registration books. In a few instances there is evidence from the registrant himself that he registered illegally. There is evidence that persons not entitled to register were collected at camps located in the city and taken from there to the courthouse to be registered when the parties engaged in having them register knew that their registration was illegal. There is evidence that these unlawful registrants were admitted to the place of registration through a back door to the courthouse so that they might not be delayed by the voters entering in the regular way. There is evidence that the registration was obstructed so that white people were prevented from reaching the place of registration, and that negroes were given a preference in the lines; that white people were pulled out of line and negroes substituted in their places; that Democratic workers at this registration were insulted; that foul and indecent language was used about the place of registration so that white women might be frightened away; that the Democratic workers appealed to the city officials to correct the abuses, but received no assistance. Some of the witnesses who were Democratic workers on the supplemental registration days paint a vivid picture of irregularities and abuses.

The testimony offered by appellants as to the irregularities at the supplemental registration was refuted by the testimony for appellees and standing alone it appears to us that the evidence as to irregularities at the supplemental registration is not impressive. Many of the things that happened which have been construed into irregularities are of slight significance, and some of the things are exaggerated. There is tangible evidence that an effort was made to register the names of those who had no right to vote, and that the purpose was to have the names voted by impostors at the regular election, but, without the corroboration of what actually took place on the day of the election in the voting of impostors, we would not treat the evidence as to irregularities at the supplemental registration as of very great importance.

We come now to a more serious matter and that relates to the conduct of those in active charge of the Republican campaign relating to the purgation proceedings. The evidence is convincing that the "inner circle of practical men in the Republican organization" conceived the idea that it was to their best interest to leave on the registration books the names of those who should have been

stricken therefrom. These men knew the names of those who should be stricken, and their conduct cannot be explained so that it will harmonize with an innocent intent. More than 10,000 names were challenged by the Democratic workers throughout the city.

The law prescribes a feasible way for the purging of the polls. Section 1486b-17, Ky. Stats. Supp. 1926, confers upon the county executive committee for any city or county of either of the political parties having representation on the state board and county board of election commissioners the right to ask that the polls be purged. When this is done it becomes the duty of the county board of election commissioners to appoint two officers for any precinct where the right of voters to have their names on the registration books has been challenged. The request for a purgation of any precinct must be made in writing to the county board of election commissioners not later than the 25th day of September in any year. In making the request the party committee must give the name and address of each voter whose name is challenged. Not later than the 1st day of October the board of election commissioners must appoint an officer representing each political party to appear at the polling place to hear and consider the challenges. These appointments must be made from a list of names submitted to the county board of election commissioners by the governing authority of each of such political parties. The list of the challenged voters in such precinct is turned over to each of these purgation officers and they are requested to meet in the precinct at a place designated by the sheriff. Each voter who has been challenged must be notified of the time and place of meeting by written notice addressed to the voter at the residence on the registration books, and this notice must be printed and mailed by the county court clerk at least 5 days before the day of hearing. These purgation officers may hear witnesses and ascertain the facts, and it is their duty to strike from the registration books the names of those not entitled to vote. If the officers disagree as to whether any names should be stricken from the books it is their duty to reduce to writing the facts which shall be turned over to the clerk of the circuit court, and the matter then comes before the circuit court. Provision is made for the execution of the notice, and there can be no excuse for the failure to execute the notice on a challenged voter in the way provided by the statute. These officers have the registration books before

them, and it was never contemplated by the General Assembly, when the law was enacted, that the officers of any political party would refuse to discharge a duty so simple.

It is the duty of the officers not only to strike from the registration books those who were illegally registered at the last regular and supplemental registration, but it is also their duty to strike from the books the names of those who are no longer entitled to be registered. It was so held by this court in the case of Poston v. Daily, 210 Ky. 649, 276 S. W. 554. The evidence discloses that in many precincts the Republican purgation officer refused to discharge his duty. In some instances they refused because they were ordered to do so by some one seemingly in authority in the precinct. Others refused because they claimed to have orders from Republican headquarters that they were not to take any part. Republican headquarters sent out a letter to the Republican purgation officers, in which these officers were advised that they were not expected to find out or determine the present status of the voters, as that was a matter to be determined by the courts or the regular election officers on election day. In some instances the evidence shows that the Republican purgation officers refused to strike from the books the names of those admittedly ineligible to vote. As a result of the refusal of these officers to discharge their duty the registration books contained the names of many hundreds of voters and probably many thousands who had no right to vote. When those having charge of the Republican organization sent their precinct books to their election officers on election day, no one was marked ineligible on the organization books unless it had been marked cancelled officially on the registration books. Not only the registration books had illegal names, but the organization books of those interested in the Republican ticket also contained the names of those not entitled to vote. All of this grew out of the refusal of the purgation officers aforesaid to discharge their plain duty under the law.

When the purgation officers refused there was no remedy left to purge the polls, except through proceedings in the circuit court, and it requires little thought to arrive at the conclusion that this was impossible during the limited time for the hearings. There is proof showing that the service of the notices was delayed by some of the officers whose duty it was to execute them. It is

true that many names were striken by the circuit court, and it is surprising how great was the number. It appears that 2,673 were stricken and motions to strike were overruled as to 1,600 registrants. The large number of names considered by the circuit court is explained only upon the theory that the attorneys representing the Republicans, as well as the attorneys representing the Democrats, sought to purge the polls honestly and intelligently when the matter reached them. This is disclosed by the evidence. Both the attorneys representing the Republicans and the Democrats appear to have discharged their duties faithfully. If the proportion of the sustained challenges to the names challenged in cases which were heard would have obtained in the cases of the other names challenged, but hearings on which challenges could not be had on account of lack of time, it would have resulted in more than 6,000 names being stricken. This tends to show the enormous number of names on the registration books on election day which should not have been there. The difficulty of ascertaining the names of all those who had no right to vote and interposing a challenge is obvious. It is the duty of all officials having anything to do with elections to attempt honestly and faithfully to see that everything is done which can be done to prevent the casting of illegal votes on election day. The failure of those in charge of the Republican campaign to aid in the performance of this duty is a strong circumstance going towards the establishment of a conspiracy having for its purpose the casting and counting of illegal votes on the regular election day.

Those in charge of the Republican campaign—and when we refer to those in charge of the campaign we refer to the same group of men described in the opinion of the chancellors as "an inner circle of practical men"— appear from the evidence to have devised a plan for the voting of the names of those wrongfully on the registration books. The evidence shows that some one caused to be printed certain slips with blanks thereon for the name of the voter, the ward, and precinct, where he was supposed to vote, and a description of the voter as it appeared upon the registration books. Much evidence is taken touching these slips. The evidence is conflicting and in some instances the same witness examined at different times made statements flatly contradictory. The purpose of this proof offered by appellants was to show that the same "practical men" who were running the

campaign selected the names of those illegally on the registration books and had the descriptions carefully copied on these slips. The proof shows that this work went on over a restaurant immediately preceding the election. There is proof showing that many hundreds of these slips were made out and the circumstances tend to show that, if they were made out as charged, the purpose was to get such a slip into the hands of some one who was willing to vote illegally, whose description closely approximated the description of the illegal registrant. The witnesses for appellees offer reasons apparently legitimate for the making out of the slips which might satisfy the mind of the court, if the actual happenings on election day did not conclusively show that some guiding hand was directing the operation of repeaters on the day of the election. It may be the purpose for which these slips were obtained was innocent, and it may be that those in charge of the Republican campaign had no intention that they should be used for any illegal purpose, but there is proof that they were so used. If those in charge of the Republican campaign were using these slips for legitimate purposes, they are the innocent victims of circumstances which enmesh them in such entanglements that extrication is almost impossible.

It is charged by contestants, and the evidence tends to support the charge at least to some extent, that those in charge of the Republican campaign caused to be prepared a large number of metal checks which are known in this record as bulldog checks. They are thin disks of aluminum slightly less in circumference than a half dollar with the impression of a bulldog on one side. The proof in some instances shows that these checks were used as evidence that an impostor had been able to vote in some precinct on election day, and that when the check was presented to the pay-off men the impostor was paid for his vote. The explanation of the bulldog check is another thing which is difficult. The witnesses for appellees attempt to show by their evidence that the bulldog checks were procured to be used as a legitimate method of identifying their workers in the city on election day. This explanation may be correct and it may be that they were not used for any other purpose, but there is evidence offered by appellants showing that these checks were used in several of the precincts and were seen in the hands of illegal voters, and some wit-

nesses testify that they saw these impostors present the checks to the pay-off men and collect money for their illegal votes.

It is argued by counsel for appellants that, after those in charge of the Republican campaign had succeeded in placing illegal names on the registration books and had then succeeded in preventing the striking off of thousands of names, and after having by careful poll ascertained the names and description of such illegal registrants, they proceeded to have slips made out to fit the illegal registrants for the purpose of using them, pursuant to their conspiracy, on the day of the election, and also that they procured the bulldog checks to better enable them to pay the impostors and keep in touch with them so that they could receive their money and not get away until after they had done a full day's work. It is then insisted by counsel for appellants that it was necessary to have camps or stations where the impostors could be kept and used as opportunity presented itself, or as the exigencies of the case demanded.

The evidence fully establishes that there were camps or stations where a large number of people of all colors, nationalities, and descriptions were congregated on election day. A number of these camps or stations were established in different parts of the city and four or five of them are described in detail and with some particularity. Automobiles of all kinds and classes were assembled at these places. Loads of negro voters were hauled to different precincts, and reputable witnesses testify that they entered the polls of one precinct after another, and that the purpose of the activities at these camps was to fit an impostor to a name and description appearing upon the registration book in some precinct and then get him to the precinct so that he could vote under that name. When he had accomplished his purpose once, he was sent to some other precinct, in some instances after he had changed clothes, where he would fit some other description and he was given a name such as appeared on the registration books at that precinct. There is little doubt that illegal voters were concentrated at these camps, and there is little doubt that many of them were sent into vote and did vote in numerous precincts throughout the city.

It would take up too much space and time to follow the conspiracy step by step as it unfolded and operated on the day of the election. The slips described as re-

peater slips by counsel for appellants were used to some extent, but their use was unnecessary in many of the precincts. The bulldog checks were used to a limited extent. Illegal votes in large numbers were cast in 35 or 40 precincts of the city, as disclosed by the evidence, and it is inferable from the evidence that the number of illegal votes cast in some of the other precincts must have been large. The evidence discloses that the names of dead men were voted in many instances; that the names of women who had registered under their maiden names and thereafter married and again registered under their married names were voted under their maiden names which had not been stricken from the registration books; that the names of those who had left the city and the state were voted; that the names of those who had removed from the precinct were voted; that the names of the sick and those absent from the city on business were voted; that the names of those who through neglect or indifference did not attend the election were voted; that the names of those who had been stricken from the registration books by order of some judge of the circuit court were voted; that names of those who did not appear at all on the registration books were voted; that negroes voted the names of white registrants; that the names of some registrants were voted twice; that the names of legal registrants who had not appeared at all at the polls were voted; that the names of those illegally on the books were voted more than once in some instances. All of these votes were cast by hired impostors, and the chancellors found that there were 900 of such votes which could be segregated, described, and named.

At many precincts those offering to vote were challenged and when they wrote their names as required by law it bore no resemblance to the name on the registration book. Many voted whose description on the registration book did not tally with the description of the person offering to vote. In some instances those offering to vote under one name and being refused returned and voted under some other name. In some instances those of an opposite sex from the registrant voted the name of the registrant. Some who were young voted the name of a registrant shown to be old. Many times voters appeared and offered to vote the name of some one on the registration books when the name had already been voted. Whether the last one offering to vote was the real registrant or a hired imposter no one knows, and

no one can tell whether the one who had voted the name was the real registrant or a hired impostor.

In many precincts every one who offered to vote the name of any one appearing on the registration books was allowed to vote. There were no challenges. The voter brought in a card with a name on it and laid it down on the table before the election officers and if that name appeared on the books the voter was given a ballot and allowed to vote. In some precincts no challenges were allowed and when a challenge was made no attention was paid to it. In others when a voter was challenged and his right to vote was under investigation, the clerk of the election continued to issue ballots rapidly to others before the challenger had an opportunity to challenge them. In many of the precincts there was a rush in the early morning and the voting places were filled with voters clamoring for a ballot. The names of those stricken by the circuit judges were the favorite names to be voted by impostors, or by persons so stricken, before a certified copy of the order from the judge could be obtained.

The greater part of this illegal voting took place in precincts largely inhabited by negro voters. In some of these precincts the officers were fair and honest and refused to allow any one to vote when it was shown that he had no right to vote. These officers, shown by the record to be honest and to have discharged their duties impartially, testified in many instances that no illegal votes were cast in their precincts; but the evidence discloses that they were mistaken and that the consummation of the conspiracy was so insidious that even honest election officers were deceived. In one precinct an active, fearless Democratic lawyer acted as challenger. He challenged 51 impostors who appeared in his precinct and offered to vote. His challenges were sustained probably in every case. He and the officers prided themselves that no impostor had got by them, but an examination of this record shows that counsel for appellees admit that 24 impostors did get by them and cast their ballots and had them counted, while counsel for appellants insist that 46 impostors voted in that precinct. At another precinct a Democratic challenger testified that from 60 to 80 challenges made by him were sustained in his precinct, and, notwithstanding the belief of him and the officers of the precinct that no impostors voted, the record shows that their alertness did not prevent the casting of votes in his precinct by impostors. Many men of the

highest character and brightest minds to be found in the city of Louisville acted as challengers for the Democrats in different precincts. In every instance where the Republican workers in the precinct showed a disposition to be fair the challenges were sustained, and they testified that in their judgment no illegal votes were cast, yet the record is strongly against them and the record is supported by the admission of counsel for appellees. In other precincts the challengers were not allowed to perform their duties and they were ignored. In other precincts no challenges were made. If dozens and scores of illegal voters offered to vote in some of the precincts and were rejected on account of the integrity of the officers of the election and the vigilance of the challengers, we can only imagine what happened when they offered to vote in the precincts where there was no active challenger or where his work was ignored and where the officers of the election had nothing in view other than to get ballots in the ballot box to aid in the election of their candidates. That these impostors went from precinct to precinct is shown by the evidence.

No one knows how many names were on the registration books which ought not to have been there. No one knows how many legal voters were sick or absent on election day. No one knows how many who were legally registered declined to vote on account of indifference. Certainly no one knows and no one can tell from this record how many impostors voted in that election.

We have not undertaken to mention in detail many things that happened both outside and inside the voting precincts on election day. We have mentioned enough to show that no election can be free and equal held under the circumstances and conditions as was the election in the city of Louisville in 1925. There was a conspiracy and it was carried out. How many votes were placed in the ballot boxes as the result of that conspiracy can never be known, and it may be that with time, money, and diligence it could not be ascertained.

It is argued that there was no conspiracy and no illegal practices worth mentioning at this election because excellent men testified that they saw nothing wrong and knew of nothing which went on, except in rare instances, which was subject to criticism. The mayor's committee was made up of 100 prominent citizens of Louisville, and they went about over the city on election day, and, except in a few instances, they testified that they found every-

thing orderly, and that they saw no evidences of illegal practices. This naturally would be true. This conspiracy was not something that would be discovered by men of this type passing about the city. A few of the members of this committee, being a little more adventurous than the others, went into a building without invitation, and upon a very superficial investigation they found evidence of the operation of the conspiracy. There is evidence in this record that shows that the approach of the mayor's committee was a signal for order among those who were engaged in the consummation of the conspiracy. The work which was done by the conspirators in the main was done in silence. Usually everything on the outside of the polls had the superficial appearance of being quiet and orderly, and the mayor's committee according to its very nature was forced to judge by outward appearances. We do not regard its report as throwing much light on matters. They are to be commended for their efforts to bring about a fair election, but care had been taken that the work of the conspirators should be done in such a way that the mayor's committee, and other good citizens, would know nothing of it unless they discovered it by accident.

There is another thing which our duty impels us to mention and that is the expenditure of money in connection with this election. A large amount of money was expended, more than ought to be required in a city like Louisville. It is made to appear in the proof that about $140,000 was expended by those interested in the election of the Republican candidates, and about $50,000 by those interested in the election of the Democratic candidates. The amount expended for appellees only was investigated. The proof does not show directly that any of this money was expended illegally. It is true that the proof shows that much of this money was expended in connection with the registration and the purchase of equipment to be used in permanent headquarters, but, making a reasonable deduction for such sums, if the amount expended was as great as is claimed by appellants, it appears entirely too much. The custom has grown up in both parties of paying election officers a sum in addition to the legal compensation. This practice should not be countenanced by any political party. We believe there are enough intelligent, patriotic citizens in any precinct to conduct an election without additional

compensation, and no other should be recommended for appointment. The practice of having a number of paid workers in a precinct should be discouraged.

The expenditure of money to get voters to the polls for registration or to vote should be discouraged rather than encouraged. It is a sad commentary on present day politics that candidates and political parties must pay for almost every character of service rendered in elections. Political ties and patriotic impulses seem no longer sufficiently potent to impel many voters to discharge their duties as citizens. Laws regulating the expenditure of money in elections should be strictly enforced and strengthened by legislative action.

On election day those in charge of the Republican campaign had on hand in actual cash, in $1 and $5 bills, at least $32,000. They testify that none of this money was used for illegal purposes; but it was a large sum of money and was calculated to create a suspicion that an illegal use was contemplated.

It is suggested that the expenses incident to regular and supplemental registrations, as well as the expenses incident to furnishing and equipping headquarters with things that according to their nature are used from year to year, should not be charged up against the candidates at any particular general election. The registration of voters is permanent under our law, and it appears to us that such expenses as are required to carry on the work of registration and such as are necessary to permanently equip headquarters are not properly chargeable against the candidates at the general election. Deducting the reasonable cost of registration, and any other expenses which it is insisted should not be charged against the candidates, still the sum of money expended by those in charge of the Republican organization appears entirely out of proportion to the reasonable requirements in such election.

It is argued by counsel for appellees that the evidence shows that the Democrats were also guilty of illegal practices on election day, and that they had their automobiles and impostors who voted when the opportunity presented itself. The complaint is directed largely towards a negro Democratic club. Some of the evidence tends to show that this club had 1,000 members. That may be true; but, if there were 1,000 Democratic negro voters, it a point against appellees, because there

is nothing in the returns from the negro precincts from which we can conclude that they voted. If the Democrats in these precincts caused impostors to vote, they derived little benefit from it. The bulk of the proof revolves around 36 precincts. In 2 of these precincts the Democrats did not receive a single vote. In 4 of them they received one vote in each precinct. In 6 of them they received 2 votes in each precinuct. In 4 of them they received 3 votes in each precinct. In 25 of them they received less than 10 votes in each precinct, and in one of the others they received 17, another 34, another 14, another 16, another 17, another 16, another 12, another 10, another 20 and another 10. In these 36 Precincts the Republican candidates received 5,686 votes and the Democratic candidates received 255 votes. It would appear from this that the negro Democratic club did not function well on election day. There were some Democratic white voters in a few of these precincts.

But suppose the Democratic workers did do what they could to get impostors to vote, that does not tend in any way to justify or excuse the conduct of those in charge of the Republican organization, and, moreover, it is only an additional reason why no one can determine the fair result of this election. Besides virtue is not a thing peculiar to one political party and ''plotted knavery'' is not an attribute of any one party alone. The crook, the thug, the thief, the scalawag and the all-around criminal who aid in stealing elections and falsifying the results through impostors or other means, usually line up with the party which can and will pay the most for their nefarious activities. Like a ferry boat their main business is to go from one side to the other. ''Plotted knavery'' must be sternly condemned whether it exists in one party or another, and, where its existence is proven and a fair and equal election was not held as a result thereof, the election should always be declared invalid whether it hurts one party or another.

What we have said is sufficient to show that the chancellors were fully justified in the use of language in describing the acts of the conspirators which should never be forgotten either by honest men or crooks. The chancellors found, however, that the law was not broad enough, as they construed it, to warrant their declaring the election invalid. As the case comes to us there are three questions presented by the evidence. We might agree with the chancellors that the result of the consum-

mation of the conspiracy can be separated from the honest votes, and as the illegal votes named and described are not sufficient to change the result of the election, it should be upheld as valid. We might agree with the chancellors to the extent that the good can be separated from the bad, and by throwing out the precincts where abundant fraud is proven, determine that the Democratic candidates had a clear majority of the legal votes. Or, if we do not agree with the chancellors at all as to the extent of the illegal votes cast by impostors, we may hold that so much fraud has been shown that we cannot determine who were fairly elected, and declare the election invalid. These questions can only be determined from the evidence in the record.

We cannot agree with the chancellors in their conclusion in this case that courts can consider only the illegal votes definitely shown and isolated from the legal votes. We cannot agree that a fair inference can be drawn from the evidence that all, or substantially all, of the illegal votes have been shown by the evidence. Therefore we cannot agree that what is known as the mathematical rule, in this case, should be applied. It is a rule which ought always be applied when the fraudulent votes can be separated from the valid votes, but, where there has been so much fraud that it is not possible to make the separation, the mathematical rule should not be applied. There is a clear distinction between the line of cases holding that the mathematical rule should be applied when it is possible to separate the good from the bad as it were, and that line of cases holding that, where the very warp and woof of the whole fabric is so intermingled with validity and invalidity, the two cannot be separated. The mathematical rule in this case should not be applied, and the appellees allowed to retain the offices to which they, nor we, know not whether they were fairly elected.

Still that does not end the question of whether the mathematical rule may be applied to the case. If the court should be unable to separate the legal votes from the illegal votes in certain precincts, it might throw out all of the precincts where the fraud makes it impossible to ascertain the number of legal votes cast. By following this method, and adding to the proven illegal votes in precincts not thrown out the total vote received by the Republican party in the precincts so thrown out, we

might reach the conclusion that the Democratic candidates were elected, and thus adjudge them the offices. We cannot say from this record that they were elected when there is no way to determine to a reasonable certainty that they were. It would be as far wrong as allowing the appellees to retain the offices which they hold when no one knows whether they were elected thereto and when the record certainly shows that they were not fairly elected thereto.

Section 6 of our Constitution, which is included in the Bill of Rights of that instrument, provides that all elections shall be free and equal. An election where sufficient ballots are not furnished to enable all of the legal voters to cast their ballots has been held an election which is not free and equal. Wallbrecht v. Ingram, 164 Ky. 463, 175 S. W. 1022. The same rule would apply where legal voters had been deprived of their right to vote for the reason that impostors had already voted for them. The failure of election officers to supply ballots, booths, or stencils renders the election not free and equal. Hocker v. Pendleton, 100 Ky. 726, 39 S. W. 250, 19 Ky. Law Rep. 135. Where challengers are not given an opportunity to have the challenges heard, where impostors crowd the polls and are allowed to vote, and where violence is practiced and threats are made, the election is not free and equal. The facts which we have briefly detailed in this opinion show that it was impossible to hold an election within the meaning of the above-mentioned constitutional provision. It has been held that, where certain candidates had control of the suffrage of a large percentage of the voters through a secret organization, it amounts to such intimidation as to render the election void because it was not free and equal. Burns v. Lackey, 171 Ky. 21, 186 S. W. 909.

Section 151 of the Constitution requires the General Assembly to provide suitable means for depriving of office any person who procures his election through the unlawful use of money or other thing of value, or who has been guilty of fraud, intimidation, bribery, or any other corrupt practice, and this section provides that such person should be held responsible for acts done by others with his authority or ratified by him. We have found that the appellees did not consent, so far as this record discloses, to the formation and execution of the conspiracy at this election. It has never been deter-

mined what amounts to ratification of such acts. The appellees specifically ratified the acts of the Republican campaign committee when they left it to that committee to control and manage the election. That commitee did not control and manage the election, but left the management and control thereof to others within the Republican organization, and it might be said that the appellees are responsible for what the campaign committee did in this respect, and that they therefore ratified the acts of those men within the Republican organization who were responsible for the conspiracy. As they had no knowledge of what was done, it could only be a ratification by acquiescence or through the approval of what was done by the campaign committee when it left the management of the campaign to some of those who were responsible for the conspiracy. This was not sufficient ratification. At all events the conspiracy operated to the benefit of appellees, and, whether consciously or not, they are now enjoying the fruits of the unlawful conduct of those who brought the conspiracy into being and perpetrated frauds in the election.

Section 1596a-12, Ky. Stats., contains this provision:

> "In case it shall appear from an inspection of the whole record that there has been such fraud, intimidation, bribery or violence in the conduct of the election that neither contestant nor contestee can be adjudged to have been fairly elected, the circuit court, subject to revision by appeal, or the Court of Appeals finally may adjudge that there has been no election. In such event the office shall be deemed vacant, with the same legal effect as if the person elected had refused to qualify."

We need not rely on the opinions of courts in this, or other jurisdictions, for authority to declare that there was no election in the city of Louisville and county of Jefferson on the regular election day in 1925. This authority is found in the statute above quoted as well as in the constitutional provisions previously referred to. We are not without authority found in the opinions of this and other courts to declare that there was no election. Where, from an inspection of the entire record, the court cannot determine that any candidate was fairly elected because of fraud, intimidation, bribery, or violence in the conduct of the election, the court not only

has the power, but it is the solemn duty of the court, to adjudge that there was no election. Ford v. Hopkins, 141 Ky. 181, 132 S. W. 542; Stewart v. Rose, 113 Ky. 502, 68 S. W. 465, 24 Ky. Law Rep. 347; Wilkins v. Duffy, 114 Ky. 111, 70 S. W. 668, 24 Ky. Law Rep. 913; Orr v. Kevil, 124 Ky. 720, 100 S. W. 314, 30 Ky. Law Rep. 761, 946; Butler v. Roberson, 158 Ky. 101, 164 S. W. 340; Allen v. Griffith, 160 Ky. 528, 169 S. W. 1003; Johnson v. Little, 176 Ky. 505, 196 S. W. 156, Ann. Cas. 1918A, 70; Burke v. Greer, 197 Ky. 555, 247 S. W. 715.

The case of Neelley v. Farr, 61 Colo. 485, 158 P. 458, Ann. Cas. 1918A, 23, is a case well in point and fully sustains our position that we should declare there was no election. For other cases from other jurisdictions sustaining the correctness of our position we cite the following: De Walt v. Bartley, 146 Pa. 529, 24 A. 185, 15 L. R. A. 771, 28 Am. St. Rep. 814; United States v. Cruikshank, 92 U. S. 542, 23 L. Ed. 588; Gibbons v. Ogden, 9 Wheat. 211, 6 L. Ed. 23; Littlejohn v. People, 52 Colo. 217, 121 P. 159, Ann. Cas. 1913D 610; Sailor v. Rankin, 125 Ark. 557, 189 S. W. 357; Knowles v. Yates, 31 Cal. 83; Walker v. Sanford, 78 Ga. 165, 1 S. E. 424; Snowball v. People, 147 Ill. 260, 35 N. E. 538; Sigler v. Madison County, 92 Ind. 133; State v. Malo, 42 Kan. 54, 120, 22 P. 349; Webre v. Wilton, 29 La. Ann. 610 People v. Hanna, 98 Mich. 515, 57 N. W. 738; State v. Collier, 72 Mo. 13, 37 Am. Rep. 417; Hayfron v. Mahoney, 9 Mont. 497, 24 P. 93, 18 Am. St. Rep. 757; Ayres v. Moan, 34 Neb. 210, 51 N. W. 830, 15 L. R. A. 501; Miller v. English, 21 N. J. Law, 317; People v. Thacher, 55 N. Y. 525, 14 Am. Rep. 312; Renner v. Bennett, 21 Ohio St. 431; Allen v. Wildman, 38 Okl. 652, 134 P. 1102; Mann v. Cassidy, 1 Brewst. (Pa.) 11.

It is unfortunate that the proven conspiracy operated largely in the negro precincts. No people are more interested in upholding free institutions, and the laws in support thereof, than the negro race. If he is deprived of the protection of the law, he has nothing left. The intelligent negro who is engaged continuously in placing his race on a higher plane ought to deeply resent the efforts of unscrupulous men to place upon his race the burden of their own iniquities. Every negro voter who is eligible has the right to vote, and that right is protected by the laws of our state, and no one should interfere with the orderly exercise of that right. There can be fair elections in those and other precincts in the

city of Louisville and there is a duty resting upon all political parties to see to it that no opportunity for fraud should exist in these precincts. They are unusually small in the number of voters, and time should be always given to investigate the right of any one offering to vote. There is no necessity for the order so often sounded forth by the workers in these precincts that the election must not be delayed. The average number of votes cast in these precincts is not much over 150, and that number of votes can easily be polled within three hours. When we consider that the challenges will never be a large percentage of the total vote, it will be readily seen that there is abundant time to carefully investigate every one whose right to vote is challenged. Unauthorized persons should not be allowed in the polling places, and because a man happens to be representing his party as a precinct captain or outside worker, does not give him a right to enter the polls, unless upon invitation of the officers, and then only when his presence may be needed for a lawful purpose. The crowding of the polls should not be allowed. No greater number of voters should be allowed in the polls than there are booths to accommodate them, and when a voter is challenged no further voting should be allowed until his case is disposed of. If any one should unlawfully attempt to obstruct the election under the guise of challenging voters, the election commissioners have full authority to remedy such a condition. Such conditions as prevailed in the election in 1925 should never happen again. The voters belonging to the different political parties, in the main, have the same high ideals of citizenship, and those who have respect for our institutions and laws have imposed upon them the duty to see that fair elections are held. It is a responsibility which they cannot escape, and which they should not desire to escape. We realize that there will always be sporadic cases of violence and of illegal voting, but such a thing as a systematic effort to win an election through fraud, bribery, violence, and intimidation can be prevented.

For the reasons given in this opinion we have reached the conclusion that none of the appellees were fairly elected and the further conclusion that there was no election in the city of Louisville and Jefferson county at the regular election day in 1925, and that the office now held by each of the appellees is vacant with the same

legal effect as if the person elected had refused to qualify.

The judgment, therefore, in each of the 34 cases is reversed, and the causes remanded for proceedings consistent with this opinion.

Judge McCandless not sitting.

Judge Sampson dissenting.